## LANDERS, FRARY & CLARK v. UNIVERSAL COOLER CORPORATION et al.

### No. 388.

Circuit Court of Appeals, Second Circuit.

July 6, 1936.

Bartlett, Eyre, Scott & Keel, of New York City (John P. Bartlett, Richard Eyre, and George N. Robillard, all of New York City, of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (George E. Middleton, of New York City, Edwin C. Lewis, of Detroit, Mich., and Ernest H. Merchant, of New York City, of counsel), for defendants.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is a suit to prevent the use upon electric refrigerators of the word, "Universal," which the plaintiff had used for many years in the sale of other electric household appliances of many kinds. The defendant counterclaimed to enjoin the plaintiff's use. A predecessor of the defendant, the Universal Cooler Company, had been organized in the year 1923, and began to manufacture refrigerators in the spring of 1924. These were sold in two ways; either as bare "units" to manufacturers who put them in their own cabinets, marked with their own names; or direct to the trade in cabinets, bought by the defendant and marked "Universal Cooler." Only the last are here in issue. The sales of all sorts were not large during the years 1924-5; six hundred and forty-four bare "units" and fifty-seven "Universal" cabinets. In October, 1925, the present defendant was organized and took over the business of the old company in 1926. Since that time and up to September 30, 1934, it has manufactured and sold 112,000 bare "units" and 31,000 cabinets, an average of about sixteen hundred a year until 1932, when the number began greatly to increase, so that for the year ending September 30,

1934, it was over ten thousand. The plaintiff's position is that, as it had been for many years in the field of electrical household appliances of all sorts, sold under the name, "Universal," it can protect that word against use upon any new appliance of the same general kind, even though it has not yet made or sold it. The defendant answers that a word such as "Universal," drawn from common speech and descriptive, unlike a coined word, will protect no more than the goods on which it has been actually used. Besides, it argues, the plaintiff gave it implicit assurance before the bill was filed in 1934 that it would not interfere with the name, and it has built up its business in reliance upon this. For these reasons it claims to be itself the owner of the word, "Universal," upon refrigerators, and it seeks an injunction against the plaintiff.

The plaintiff first heard of the defendant's business some time in the spring of 1926, when the defendant began to advertise on a large scale, occupying a full page of the Saturday Evening Post on April 3, 1926. On May thirteenth the plaintiff's attorneys wrote, saying that the plaintiff had for long been selling household appliances under the name, "Universal," many of them electrical, so that the word had come to mean its manufacture; that for some time in the past it had been preparing the manufacture of electrical refrigerators which it proposed to sell under that name; and that it had succeeded to the business of a well-known firm from whom it had bought the trade-mark, "Universal," and who had used it upon wooden refrigerators. For these reasons it declared that the defendant was "open to the charge of infringement," and in substance it requested it to abandon the word. (The business of which the plaintiff spoke in this letter was that of the American Wringer Company, which in 1926 sold to the plaintiff its trademark, "Universal," for use on electrical refrigerators; but as the sale was gross, nothing passed). By the summer of 1931 the plaintiff had not yet perfected its electric refrigerator; one difficulty was in getting a suitable compressor. The defendant controlled the Climax Company, which made a compressor that the plaintiff thought might serve; and the parties met in August of that year, at which time the plaintiff proposed to buy a substantial block of the defendant's shares, and that the two should manufacture in common. On August twenty-eighth, after this interview, it wrote a letter to straighten out some matters not dealt with orally. Especially it spoke of the use of the word "Universal," declaring that that would not "bother us much" unless the plaintiff went into the refrigerator business itself; in that event it could not see how it could successfully establish a dealer who could sell refrigerators if the defendant was selling a "Universal Cooler" in the same territory; the plaintiff ought then to be the only one to sell the "Universal" refrigerators. The plaintiff did buy over six thousand of the defendant's shares for about $26,000, and became one of its largest stockholders; but the Climax compressor did not turn out well, and the parties never engaged in joint manufacture or distribution. On April 19, 1932, after this proposal had fallen through, the plaintiff again wrote, speaking of its own prospects in refrigerators, and asking whether the defendant could not manufacture them for it, using the plaintiff's compressors; nothing was said about stopping the use of the word, "Universal." To this the defendant replied on the twenty-first saying that it was manufacturing in its new plant, buying its own cabinets and so forth; it discussed the general conditions in the industry, and declared that its own operations were encouraging and that its sales showed a sixty per cent. increase; it made no direct answer to the proposal of the defendant except to suggest that there might be an interview. Not before the end of the year 1932, or the beginning of 1933, did the plaintiff make any real complaint, and even then it would have been content with the use of the phrase, "Universal Cooler." Yet on April 1, 1933, apparently out of the blue, it sued a distributor to suppress the word, "Universal," altogether. That suit was dismissed by consent, though "without prejudice," and the record tells nothing more about it; neither when it was dismissed, nor why. So far as appears, it had been no more than a gesture and after its dismissal the event need not have disturbed the defendant's supposition that no real attempt would be made to stop the use, then seven years old, of a mark upon which its business had been founded. This suit was brought on June 27, 1934. The judge held that the defendant was free to use the word, "Universal," on its refrigerators, but must add the suffix, "Cooler," as it had offered to do. Both parties appealed.

It has now become settled that a man who has established his mark upon one

kind of goods may prevent another from using it upon another kind, if that be not too foreign to the first. The earliest instance we have found is Collins Co. v. Ames & Sons Corporation (C.C.A.) 18 F. 561, where Mr. Justice Blatchford while a Circuit Judge so ruled in 1882, without giving extended reasons. His decision has been frequently followed. Godillot v. American Grocery Co. (C.C.) 71 F. 873; Florence Mfg. Co. v. Dowd Co., 178 F. 73 (C.C.A. 2); Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407, L.R.A.1918C, 1039 (C.C.A. 2); E–Z Waist Co. v. Reliance Mfg. Co., 52 App.D.C. 291, 286 F. 461; Anheuser-Busch v. Budweiser Malt Products Corporation, 295 F. 306 (C.C.A. 2); Yale Electric Corporation v. Robertson, 26 F.(2d) 972 (C.C.A. 2); Duro Co. v. Duro Co., 27 F.(2d) 339 (C.C.A. 3); Waterman Co. v. Gordon, 72 F.(2d) 272 (C.C.A. 2). At times it has been suggested that the new goods must be of the same "class" as those sold by the first user of the mark. Layton Pure Food Co. v. Church & Dwight Co., 182 F. 35, 32 L.R.A.(N.S.) 274 (C.C.A. 8); Rosenberg Bros. & Co. v. Elliott, 7 F.(2d) 962 (C.C.A. 3); Kassman & Kessner v. Rosenberg Bros. Co., 56 App.D.C. 109, 10 F.(2d) 904. For purposes of registration there may be something in the distinction, but not otherwise, unless "class" be used in a very general sense, and even then it is important merely as evidence of the only really relevant fact: the trade significance of the mark or name. The right is based upon the interest which a man has in the reputation which accompanies any name identified with himself. He need not subject that reputation to the hazard of others; anyone who wishes to use the name must show a weightier interest. The right is also based upon the interest one has in extending his trade in markets which already identify him with his mark. Unless he can stop in limine its use by others, he may find, when he tries so to reach out, that the market has unlearned its lesson. The divergence of the goods to which the mark may be extended, from those on which it has been used, can therefore be important only because as it increases, the probability decreases that the market will suppose that it continues to mean the old source, or that its owner will in fact ever enter the new field.

The suggestion has at times also been made that the doctrine does not apply to a mark which is not coined, and it is on this that the defendant apparently relies.

Pabst Brewing Co. v. Decatur Brewing Co., 284 F. 110 (C.C.A. 7); France Milling Co. v. Washburn-Crosby Co., 7 F.(2d) 304 (C.C.A. 2); Treager v. Gordon-Allen, Ltd., 71 F.(2d) 766 (C.C.A. 9). We do not agree; so far as France v. Washburn-Crosby Co., supra, says anything to the contrary, it was obiter. It is quite true that, just as a coined word is easier to protect than a word of common speech upon goods on which the owner has used it, so it is easier to prevent its use upon other kinds of goods. The proprietary connotation,— "secondary meaning,"—of a word of common speech is harder to create and easier to lose, and its fringe or penumbra does not usually extend so far as that of a coined word. But that is matter of proof and of that alone; if the owner can in fact show that the fringe does extend to other goods there is no reason why his interest should not be recognized. His interest is exactly the same as though the mark were a coined word (his reputation and his chance to extend his sales); and while the plagiarist has a better excuse because the law recognizes that all have an interest in the free use of the language, the conflict is between the same interests as when the owner seeks to protect the name upon goods which he has sold. It would therefore be wrong to make any absolute distinction between coined, and colloquial, names. Nor do such cases as Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, and United Drug Co. v. Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141, offer any difficulty. These only hold that a man may not protect a mark in markets where he has never sold; they turn upon the fact that the wrong is in diverting customers by deception and that it cannot be a deception to use a mark among customers who do not know its proprietary connotation. The doctrine here at bar applies to markets where the mark is already known; it presupposes the existence of customers to whom the identity of the owner is already familiar, and a possible confusion for that reason. There is no conflict between the two doctrines.

In the case at bar there was no reason why the defendant, when it began to manufacture in 1926, should have chosen a mark which had already come to signify the plaintiff in the sale of many sorts of electrical household appliances; it had no interest in the word. True, "Universal" had already been applied to every conceivable

kind of goods, but that was material only as evidence of whether it did in fact mean the plaintiff here. Arguendo we will therefore take it that, had the plaintiff pressed its claims in May, 1926, it would have succeeded. It did not do so. On the contrary for five years it did nothing at all, and during those years the defendant's business had grown to a very substantial size. It had invested probably about $100,000 in advertising,—in all of which the word "Universal" appeared,—and its capital investment had nearly doubled; it had grown from about $500,000 to $900,000. In the face of an unequivocal declaration that the defendant must not use the mark this might not have served, but the plaintiff had not made any such. The letter of May 13, 1926, was no more than a friendly suggestion, and closed with a request only that the defendant would consider the claim, and "communicate with us at your earliest convenience." The defendant never did communicate, perhaps because the management changed not long after, and its silence, whatever the reason, ought to have aroused more than suspicion that it did not mean to stop. On the other hand the defendant, even though charged with notice, finding that the plaintiff did not press the matter further, and considering its precatory tone, had every reason to suppose that it did not mean to do anything further; that it did not really regard itself as aggrieved. Moreover, the plaintiff knew of the increase in the defendant's business, and must have understood either that it meant to test the defendant's claims, or that it had read the letter as no more than a friendly request. It appears to us, therefore, that the suit would probably have been already too late in 1931.

However that may be, there can be no doubt that what followed closed the door. We have recited the negotiations in the summer of 1931. While they were on, the plaintiff ought perhaps not to be charged with asserting its rights; and the letter of August 28, 1931, was a reasonable suggestion for a modus vivendi. But the negotiations ended before the next April and the defendant's letter of the twenty-first showed that it was doing a brisk and increasing business, among other things in cabinets. The subsequent inaction gave an added assurance, on the faith of which between the summer of 1931 and the first of July, 1934, the defendant spent over $40,000 in advertising. It seems to us immaterial that all this, and indeed all the advertising after 1926, was to the trade. The name so broadcast was applied to the cabinets, and the dealers would press their sale under that name, and indeed would probably distribute the broadsides among customers, as well as themselves advertise in local papers. That being true, it is not important that some of the money may have been spent to advance the other and larger part of the business. We need not speculate on the proportions of the division; it is apparent that on any showing the defendant spent large sums in reliance upon its apparent immunity, manifested in many ways. Moreover, the estoppel need not depend upon expenditure alone. When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses may be. No doubt if the defendant had gone ahead defiantly and fraudulently this would not count; nothing would. Menendez v. Holt, 128 U.S. 514, 532, 9 S.Ct. 143, 32 L.Ed. 526; Saxlehner v. Eisner & M. Co., 179 U.S. 19, 39, 21 S.Ct. 7, 45 L. Ed. 60. But it did not do that; the new management knew nothing of the protest, if it can be called such; it was morally innocent, and it was given repeated assurance that it might go ahead. Equity will not upset what has been founded upon such solid ground; the plaintiff has itself to thank for any confusion which may result; it is too late after all these years now to restore the parties to their relative positions at the outset.

As to the defendant's counter-claim the same considerations apply. It knew that the plaintiff proposed to use the same word on its refrigerators which it used on everything else; it said nothing, and expressly promised to use the suffix.

Decree affirmed.