**NATIONAL FRUIT PRODUCT CO., Inc., v. DWINELL–WRIGHT CO.**

Civil Action No. 1445.

District Court, D. Massachusetts.

Oct. 16, 1942.

See, also, 42 F.Supp. 1016.

Clarence B. Des Jardins, of Cincinnati, Ohio, and Gilman P. Welsh, of Boston, Mass., for plaintiff.

Edward G. Fenwick and Charles R. Fenwick, both of Washington, D. C., and Simon P. Townsend, of Boston, Mass. (Choate, Hall & Stewart, of Boston, Mass., and Mason, Fenwick & Lawrence, of Washington, D. C., of counsel), for defendant.

WYZANSKI, District Judge.

Defendant or its predecessors have used the words White House together with a representation of the Executive Mansion as a trade-mark for the sale of coffee since January 1, 1888, for tea since 1907, for roasted peanuts since 1940 and for a blend of orange and grapefruit juice since 1941. Pursuant to the United States Trade Mark Acts, 15 U.S.C.A. § 81 et seq., it secured federal trade-mark registrations for coffee and for tea in 1910 and for roasted peanuts in 1941.

Plaintiff or its predecessors have used the same mark on cider vinegar since 1907, sweet cider since about 1908, canned apples since 1918, applesauce since 1920, apple butter since 1924, apple jelly since 1931, apple pectin since 1935, evaporated apples since 1935, concentrated apple juice since 1935, prune juice since 1936, canned sauerkraut and sauerkraut juice since 1937, and apple juice since 1938. Pursuant to the United States Trade Mark Acts it secured or renewed federal trade-mark registrations for apple cider vinegar in 1915; for apple cider in 1918; for apple products, namely, canned apples, apple jelly, apple jam, marmalade, applesauce, vinegar, table apples and apple butter in 1932; for canned fruits, fruit jellies, fruit marmalade, fruit preserves, evaporated apples, fruit pectin

and distilled vinegar in 1934; and for fruit and vegetable juices for food purposes in 1936.

Plaintiff and defendant each sells its products in large volume in each of the forty-eight states.

The immediate cause for this litigation was defendant's beginning in 1941 to market a blend of orange and grapefruit juice under the mark. Plaintiff relying upon its trade-mark registrations and diversity of citizenship filed in this Court a complaint seeking an injunction against defendant's use of the trade-mark White House accompanied by a representation of the Executive Mansion in connection with that particular juice. Defendant thereupon counterclaimed seeking relief against plaintiff's use of the mark in connection with plaintiff's whole line of products.

The principal questions presented are three: (1) What rule or rules of law are applicable to this controversy; (2) under the applicable rules has defendant a right to be protected against plaintiff's use of the mark on apple products, prune juice and sauerkraut products; and (3) if not, has plaintiff a right to be protected against defendant's use of the mark on orange and grapefruit juice. The first question embraces problems of conflict of laws; the second, problems of infringement of registered trade-marks (but not, by reason of defendant's express disclaimer, problems of unfair competition); and the third, problems of infringement of registered trade-marks and of unfair competition.

Prior to Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, when the jurisdiction of a United States court was invoked in trade-mark cases, it was not customary or necessary to distinguish nicely as to what rule of law was applicable. In view of that decision, however, it is incumbent on the court to make a preliminary inquiry to determine what is sometimes called the conflict of laws question.

■ In the case at bar my jurisdiction rests both upon federal trade-mark registrations and upon diversity of citizenship; and the plaintiff, at least, premises his complaint not only on infringement of registered marks but also on unfair competition. It may at first appear that the plaintiff relies on two and only two jurisdictional props. Closer examination makes it clear, however, that plaintiff is seated on a three-legged stool: (1) Apart from any question of diversity of citizenship, it has a right to be heard by this Court on the issue of infringement of its federal registration, 15 U.S.C.A. § 97; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 323, 59 S.Ct. 191, 83 L.Ed. 195, note 4; (2) also apart from any question of diversity of citizenship, it has a right to be heard by this Court on the issue of unfair competition in so far as that issue is raised by substantially the same facts as those involved in the infringement issue, Armstrong Paint & Varnish Works v. Nu-Enamel Corp., supra, 305 U.S. at page 325, 59 S.Ct. 191, 83 L.Ed. 195; and (3) finally, on the basis of diversity of citizenship, it has a right to be heard by this Court on the issue of unfair competition, Section 24 of the Judicial Code, 28 U.S.C.A. § 41(1) (c); Dwinell-Wright Co. v. National Fruit Product Co., 1 Cir., 129 F.2d 848, 850, 851

■ The law to be applied on the first leg is federal statutory law and, where that is ambiguous or silent, federal common law. The point has been discussed so ably and so recently by S. S. Zlinkoff in Erie v. Tompkins: In Relation to the Law of Trade-Marks and Unfair Competition, 42 Columbia Law Review 955, that, borrowing from that author, I shall merely state compendiously the basis for my conclusion. Although the Supreme Court of the United States now requires that in suits where jurisdiction is founded solely on diversity of citizenship, the United States courts should apply the law of the state where suit is instituted (Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Pecheur Lozenge Co., Inc., v. National Candy Co., Inc., 315 U.S. 666, 667, 62 S.Ct. 853, 86 L.Ed. 1103, trade-mark), that tribunal has not held that where issues of validity, infringement, defenses or remedies arise under the terms of, or in the interstices of, the trade-mark laws of the United States the United States courts should apply local law. Indications are to the contrary. Compare Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L. Ed. 1381 as explained 42 Col.L.Rev. 981–983. Thus it has been held that a federal common law rather than a local common law should be applied in formulating a gloss for, or filling a lacuna in, the act governing the Federal Deposit Insurance Corporation (D'Oench, Duhme & Co., Inc.

v. Federal Deposit Ins. Co., 315 U.S. 447, 455, 456, 463, 464, 465-475, 62 S.Ct. 676, 86 L.Ed. 956), the Bankruptcy Act (Prudence Realization Corp. v. Geist, 316 U.S. 89, 95, 62 S.Ct. 978, 86 L.Ed. 1293), the National Bank Act (Deitrick, Receiver, v. Greaney, 309 U.S. 190, 200, 201, 60 S.Ct. 480, 84 L.Ed. 694), Indian treaties (Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 349, 350, 60 S.Ct. 285, 84 L.Ed. 313), and the Communications Act (O'Brien v. Western Union Telegraph Co., 1 Cir., 113 F.2d 539, 541). Even more directly in point is a decision of the Circuit Court of Appeals for the Seventh Circuit that, in so far as a complaint is bottomed on infringement of a federally registered trade-mark, the applicable law is strictly federal. Time, Inc., v. Viobin Corp., 7 Cir., 128 F.2d 860, 862. Nothing to the contrary was decided by Judge Ford in Folmer Graflex Corp. v. Graphic Photo Service, D.C.Mass., 44 F.Supp. 429, for that case involved a mark not properly registerable under the federal statutes. 44 F.Supp. at page 433.

It is more difficult to decide what rule of law applies to the second leg. Here this Court's jurisdiction over a cause of action for unfair competition does not rest on diversity of citizenship. It rests on the ground that the facts supporting that cause of action are substantially the same as the facts supporting a not "plainly unsubstantial" cause of action for violation of the federal trade mark act. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., supra, 305 U.S. at pages 324, 325, 59 S.Ct. 191, 83 L.Ed. 195; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 273, 274; Pure Oil Co. v. Puritan Oil Co., Inc., 2 Cir., 127 F.2d 6. It seems that the Supreme Court has not as yet applied Tompkins' case beyond the bounds of diversity jurisdiction cases, D'Oench, Duhme & Co., Inc., v. Federal Deposit Ins. Co., 315 U.S. 447, 467, 62 S.Ct. 676, 86 L.Ed. 956. Therefore a novel question is presented: shall a United States court which has jurisdiction over a cause of action for unfair competition only because the cause is "pendent" to a cause of action for infringement of a registered trade-mark apply federal common law or the local common law.

In answering that question it is proper to take into account Section 34 of the Federal Judiciary Act of September 24, 1789, 28 U.S.C.A. § 725; intimations in opinions of Supreme Court Justices; and considerations of policy.

■■ The 1789 Judiciary Act provided that: "The laws of the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply." As used in this statute, "laws" includes local rules of decision, Erie Railroad Co. v. Tompkins, 304 U.S. at page 73, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, note 5. But, strictly speaking, the statute applies only to "trials at common law." Russell v. Todd, 309 U.S. 280, 287, 294, 60 S.Ct. 527, 531, 84 L.Ed. 754. Although the Supreme Court has applied the principle of the statute and of Tompkins' case to many suits in equity, Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 205, 58 S.Ct. 860, 82 L.Ed. 1290; Fashion Originators Guild v. Federal Trade Comm., 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (unfair competition); Pecheur Lozenge Co., Inc., v. National Candy Co., 315 U.S. 666, 667, 62 S.Ct. 853, 86 L.Ed. 1103 (trade-marks); it is by no means clear that it will apply the principle to all such suits. See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 467, 62 S.Ct. 676, 86 L.Ed. 956, note 3. The attitude of the different justices plainly varies. The late Mr. Justice Brandeis regarded the Constitution as denying the federal courts power to apply a federal common law to any cause of action not imbedded in a federal statute creating substantive rights, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 77, 78, 80, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. While Mr. Justice Reed disagreed with that view when it was announced, Id., 304 U.S. at pages 91-92, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, he later came close to accepting it. Ruhlin v. New York Life Insurance Company, 304 U.S. 202, 205, 58 S.Ct. 860, 82 L.Ed. 1290. As Associate Justice, Chief Justice Stone seems to have first accepted the extreme Brandeis view, Erie Railroad Company v. Tompkins, supra, and then expressed a doubt. Russell v. Todd, 309 U.S. 280, 287-294, 60 S.Ct. 527, 84 L.Ed. 754. Mr. Justice Jackson has continued, on the bench, as he did at the bar, to question and to seek to limit the Tompkins case. D'Oench, Duhme & Co. v. Federal

Deposit Ins. Corp., supra. However, his views have not been shared by the other justices who appear to have at least acquiesced in applications of the Brandeis doctrine.

▪ Under these circumstances a judge of an inferior court must seek guidance from principle rather than authority. It is difficult to find support for the statement of Mr. Justice Brandeis that a constitutional principle is involved. Article III, Section 2, of the United States Constitution, which extends the judicial power to "Controversies * * * between citizens of different States," in the same section extends the judicial power to "Cases of admiralty and maritime Jurisdiction." It has not been doubted since the time of Chief Justice Jay that this section ex proprio vigore permits a United States court sitting in admiralty to apply in the field of admiralty what may for convenience be called a federal common law. The Betsey, 1794, 3 Dal. 6, 1 L.Ed. 485; The Lottawanna, 21 Wall. 558, 574, 575, 22 L.Ed. 654; Southern Pacific Co. v. Jensen, 244 U.S. 205, 215, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900. Logically the same section should, in the absence of a restricting statute, likewise permit a United States court sitting in a case where there is diversity of citizenship (and a fortiori in a case where there is a pendent jurisdiction) to apply a federal common law. The constitutional grant of the power to decide embraces a grant of power to formulate the law to be applied in the absence of a statute.

▪ But even though the Constitution permits the United States Court to apply a federal common law in a case where it has jurisdiction and where there is no applicable legislative restriction similar to Section 34 of the Judiciary Act, it does not follow that the Court should do so. The basic argument against a federal common law in the type of case ordinarily cognizable in the state courts has been convincingly put by John Chipman Gray, The Nature and Sources of the Law, 2nd Ed., p. 249. Since the United States courts sit in the same territory as the state courts and exercise what must be regarded as a jurisdiction of an exceptional character, it is desirable that they should apply the same rules of law as the local state courts. Compare D'Oench, Duhme & Co. v. Federal Deposit Ins. Co., 315 U.S. 447, 455, 62 S.Ct. 676, 86 L.Ed. 956. Stated in this way, the principle is broader than a principle of not allowing a person whose cause of action is in the United States courts by the accident of his citizenship (or by the accident that another cause of action is supported by the same facts) to secure a discriminatory benefit from a rule of law peculiar to the federal tribunals. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 74, 75, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. It is broader than a principle that where the plaintiff has an option to sue in either the courts of the United States or those of a state, he shall be bound by the same law. D'Oench case, supra, 315 U.S. at pages 466, 467, 62 S.Ct. 676, 86 L.Ed. 956.

Contrary arguments in favor of applying a federal common law to a cause of action for unfair competition heard in the United States courts solely because it is pendent to a cause of action for infringement of a federally registered trademark will be found in Mr. Zlinkoff's article already cited—particularly at 42 Col.L.Rev. pp. 986–990. The following sentences summarize and perhaps expand his arguments. There is an anomaly in the same tribunal applying to the same set of facts at the same time two different rules of law. Moreover, where a federally registered mark is involved, the problem of unfair competition, by hypothesis, involves commerce among several states, and alleged torts in several states. In such a case reference to the law of the state where the United States court sits requires a consideration not only of local tort rules, but also of local state rules of conflict of laws, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; and if those local state rules of conflict of laws were those set forth in American Law Institute, Restatement, Conflicts, §§ 378, 383, 384, then the United States court would be required to frame its opinion, mould its decree and assess damages for each state where the alleged tort occurred. R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 89 col. 2; Triangle Publications v. New England Newspaper Publishing Co., D.C.Mass., 46 F.Supp. 198, 203. See Note, 41 Col.L. Rev. 1403. Again, in many states there is, because of the long reign of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, now in existence no body, or at least no modern body, of local law of unfair competition. Reference to local law would sometimes be reference to archaic decisions. At oth-

er times it would be meaningless because there would be no local decisions and the federal courts would have to indulge in a presumption that local courts, when the matter came before them, would follow federal decisions and text books citing exclusively federal decisions. Cf. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 113, 59 S.Ct. 109, 83 L.Ed. 73, note 1. Finally, unfair competition is under modern conditions of national commerce a subject adapted for national, uniform treatment, more particularly since large investments have been made on the faith of the broad protection the federal courts developed between 1900 and Tompkins' case in 1938. Cf. Robert S. Lynd, The People As Consumers, Report of President Hoover's Research Committee on Recent Social Trends In The United States, vol. II, ch. XXII, p. 876.

■ Those arguments do not seem to me controlling. It seems to me more anomalous for a rule of law to be selected for a cause of action for unfair competition because the cause is appended to another, than to hold that the cause is the same no matter in what forum it arises or with what it is joined. The danger arising out of the doctrine of the Klaxon case strikes me as largely fanciful, at least in this District. The Massachusetts State Court has, it is true, cited the Restatement of Conflicts, Strogoff v. Motor Sales Co., Inc., 302 Mass. 345, 347, 18 N.E.2d 1016, and has applied to automobile accidents and the like the principle that the law of the place of wrong determines whether a person has sustained a legal injury, Id.; Murphy v. Smith, 307 Mass. 64, 65, 29 N.E. 2d 726; Smith v. Brown, 302 Mass. 432, 433, 19 N.E.2d 732. But, the Massachusetts court has never applied that principle to cases where unlawful competition was alleged to have occurred in several states. Hub Dress Mfg. Co. v. Rottenberg, 237 Mass. 281, 283, 129 N.E. 442; Kaufman v. Kaufman, 223 Mass. 104, 108, 111 N. E. 691; C. A. Briggs Co. v. National Wafer Co., 215 Mass. 100, 105, 102 N.E. 87, Ann.Cas.1914C, 926. This may be because the point was not raised by counsel; but I prefer to believe that the Massachusetts court has the robust common sense to avoid writing opinions and entering decrees adapted with academic nicety to the vagaries of forty-eight states. And until Massachusetts adopts a checker-board jurisprudence, the Klaxon case does not re-

quire this Court to do so. The next argument set forth in the preceding paragraph is likewise unsound in this District. The Massachusetts courts have a large, current and modern body of law of unfair competition and they have not customarily been criticized on the ground they were more likely to follow liberal decisions of other courts than conservative precedents of their own. Finally, the point that national commerce requires a national rule of unfair competition is peculiarly appropriate for consideration by the legislative rather than the judicial branch of the government. See Mr. Justice Brandeis in International News Service v. Associated Press, 248 U. S. 215, 262, 263, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. Indeed it might well be said that when Congress established the Federal Trade Commission to prevent what are now described as unfair methods of competition in commerce [15 U.S.C.A. § 45], Congress indicated that it preferred to have such uniform federal rules as might be appropriate initially devised and applied not by federal courts but by a federal administrative agency. I believe it cannot fairly be said that Congress went further and (in accordance with the doctrine of the D'Oench and other cases cited at page 3, 47 F.Supp. 502 above) authorized the federal courts to develop a rounded federal common law of unfair competition. Fashion Originators Guild v. Federal Trade Comm., 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed. 949, Pecheur Lozenge Co., Inc., v. National Candy Co., Inc., 315 U.S. 666, 667, 62 S.Ct. 853, 86 L.Ed. 1103.

■ I therefore conclude, as has previously been held by Judge Ford in this District (Folmer Graflex Corp. v. Graphic Photo Service, D.C.Mass., 44 F.Supp. 429), and by the Seventh Circuit Court of Appeals (Time, Inc., v. Viobin Corp., 128 F. 2d 860; Rytex v. Ryan, 7 Cir., 126 F.2d 952), that where a United States court has jurisdiction over a cause of action for unfair competition solely because the cause is "pendent" to a cause of action for infringement of a registered trade-mark, the court must apply local common law.

■ The same reasoning requires, a fortiori, that where a United States court has jurisdiction over a cause of action for unfair competition because of diversity of citizenship, and also has jurisdiction (or as in Pecheur Lozenge Co., Inc., v. National Candy Co., Inc., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. ——, has not jurisdic-

tion), over a cause of action for infringement of a registered trade-mark, the court must apply local common law.

Turning now to the merits of the case, I shall first consider whether defendant has a right to be protected against plaintiff's use of the mark on what may be conveniently grouped together as apple products, prune juice and sauerkraut products. Defendant having disclaimed any cause of action for unfair competition, its counterclaim is limited to trade-mark infringement simpliciter.

Defendant's federal registrations of the mark for coffee and tea entitle it to invoke Section 16 of the Trade Mark Act of Feb. 20, 1905, c. 592, 33 Stat. 724, 728, 15 U.S.C.A. § 96. That section provides in part that: "Any person who shall * * * copy * * * any such [registered] trade-mark and affix the same to merchandise of substantially the same descriptive properties as those set forth in the registration * * * or shall have used * * * such * * * copy * * * in commerce among the several States * * * shall be liable to an action for damages therefor at the suit of the owner thereof." Section 19 of the same Act, 33 Stat. 729, 15 U.S.C.A. § 99 gives power to grant injunctions in addition to the damages just provided for.

A priori it might have been supposed that a narrow construction would have been given to the phrase "substantially the same descriptive properties", so that, for example, a mark for locks could not be protected against its use for flashlights. However, borrowing from the general law of unfair competition (which they were simultaneously developing under the tolerant, then prevailing, rule of Swift v. Tyson), the lower federal courts have given to the statutory phrase the same scope they gave to the non-statutory law of trade-marks. This was plainly held in Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972, 974 col. 2; Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962, 964; California Fruit Growers Exch. v. Windsor Beverages, Ltd., 7 Cir., 118 F.2d 149, 153. Compare American Steel Foundries v. Robertson, 269 U.S. 372, 381, 46 S.Ct. 160, 70 L.Ed. 317; B. F. Goodrich Co. v. Hockmeyer, 40 F.2d 99, 103, 17 C.C.P.A., Patents, 1068. It was implicit in a host of cases in every circuit, of which the following are typical: Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.,

6 Cir., 119 F.2d 316, 325; Mantle Lamp Co. of America v. Aladdin Mfg. Co., 7 Cir., 78 F.2d 426; Walgreen Drug Stores v. Obear-Nester Glass Co., 8 Cir., 113 F.2d 956, 960–961; Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 34 F.2d 774. Thus, in interpreting Section 16 of the Trade Mark Act of 1905 the federal courts now have two equally valid groups of federal cases upon which to draw: first, those that expressly interpret the statutory phrase "substantially the same descriptive properties"; and second, those that (being older than Tompkins' case) apply as part of a federal common law of unfair competition a doctrine extending trade-mark protection from the goods to which it was originally affixed to kindred goods.

Both these lines of federal authority make it clear that during the first four decades of this century the inferior federal courts gradually broadened the protection given to an owner of a mark. Whereas once his right was limited to protection against the passing off of another's goods as his own; later he was entitled at least in most federal courts to complain if others used his mark on goods which prospective purchasers would reasonably regard as coming from him. The history of this change of doctrine is conveniently summarized in Am.L.Inst., Restatement, Torts, §§ 712, 717, 730. The philosophy of the new approach has been best expressed in a series of opinions by Judge Learned Hand that have become classics of trade-mark law. S. C. Johnson & Son, Inc., v. Johnson, 2 Cir., 116 F.2d 427, 429; Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., 2 Cir., 105 F.2d 908; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272; Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46, 48; Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972. As Judge Hand has observed, the owner is regarded as having an interest in not having another destroy the distinctiveness of his mark by borrowing it, Yale Electric Corp. v. Robertson, supra, quite apart from his interest in not having another tarnish the mark by using it on inferior merchandise. He is also regarded as having an interest in extending his trade in markets which already identify him with his mark. Landers, Frary & Clark v. Universal Cooler Corp., supra. It is important, however, to note that despite pleas which have sometimes been made by the bar, the usually

506

accepted basis for the plaintiff's relief is not that the defendant has secured an unearned benefit, or merely that the public may be deceived. S. C. Johnson & Son, Inc., v. Johnson, supra.

It is quite possible that today we stand on the threshold of a change of viewpoint. The principle extending the protection of a mark to products different from those to which it was attached by the originator, has been attacked by some philosophical jurists, by some economists and by some students of the consumer movement. The jurists point out the fallacy in the theory that protection is necessary to safeguard a value created by the originator of the mark. That theory, it is said, "purports to base legal protection upon economic value, when, as a matter of actual fact, the economic value of a sales device depends upon the extent to which it will be legally protected." Felix S. Cohen, Transcendental Nonsense and The Functional Approach, 35 Col.L.Rev. 809, 815. They add that it tends to promote undesirable monopolies since the "stock of available trade-marks presenting psychological advantages in certain classes of products is seriously restricted today." Stephen Ladas, Trademarks and Names, Encyc. Soc. Sciences, vol. XV, 57, 59; F. S. Cohen, supra, p. 817. Some economists assert that extension of trademarks is undesirable because it prevents the lowering of prices which would otherwise occur, both on branded and even on competing unbranded merchandise. Twentieth Century Fund, Does Distribution Cost Too Much? (1939) p. 304; Robert S. Lynd, The People As Consumers, Report of President Hoover's Research Committee on Recent Social Trends In The United States, vol. II, ch. XXII, p. 875, n. 35; Sidney and Beatrice Webb, Industrial Democracy (1920 Ed.) pp. 683, 684. They say it also tends to diminish the role which merchants formerly performed as expert advisers to the consuming public. Ibid, p. 683. Furthermore, advocates of the consumers' interest often oppose legal tendencies to expand the coverage of a brand mark because their belief is that it tends to restrict reliance upon grade marks carefully describing exact quantity and quality, which these advocates champion. Lyon, Watkins & Abramson, Government and Economic Life (Brookings Institution 1939) vol. 1, pp. 229–253; M. G. Reid, Consumers and The Market (1938) pp. 362–378; A. T. Poffenburger, Psychology In Advertising (2nd Ed., 1932), pp. 312–321; Twentieth Century Fund, supra, p. 302. Cf. Temporary National Economic Committee, Monograph No. 24, Consumer Standards (1941), pp. 44, 348.

Perhaps most of this attack is launched not merely at the extension, but at the very existence, of trade-mark protection. However that may be, there remains much to be said for the hitherto prevailing principles protecting a trademark against use on kindred products as well as on the identical product. Regardless of how clearly philosophers now show the fallacy of asserting that trade-marks have a value apart from judicial protection, businessmen previously have been willing to place as high a value as forty-two million dollars upon a single trademark, undoubtedly partly because they thought it could not be used by others on the same or related goods. Ibid, p. 348; Robert S. Lynd, The People As Consumers, Report of President Hoover's Research Committee on Recent Social Trends In The United States, vol. II, ch. XXII, p. 876. Courts should hesitate, by reversing the trend of their decisions, to destroy the economic values which those very decisions created. If the abuse is great, Congress can amend the statute.

The asserted dangers of monopolies are undeniably not so great in trade-marks as in patents or certain other fields. As to marks derived from coined words, the establishment of what is loosely called a monopoly presents no possible threat to competitors or to the public. And as to marks taken from an existing vocabulary, the courts can create safeguards. Indeed they already have guarded against the threat. Cf. Restatement, Torts, § 731 (f); see cases cited though not completely followed in Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46, 48, col. 2. As to prices, it may be that there are public advantages as well as disadvantages in trade-marked articles. While in times of stable or declining prices branded goods may be over-priced, in times of rising prices branded goods, contrary to the market as a whole, may maintain rigidity of prices since to the consumer their price is as familiar a standard as is their name. As to the argument that the effect of manufacturer's brands is to dimin-

ish the role of merchants there are several answers. Merchants themselves, as the testimony at bar showed, develop their own brands for their own protection. P. D. Converse, Essentials of Distribution (1936), p. 119. And in the resulting Tower of Babel it may well turn out, as the consumer groups hope, that many customers will make their final selection not by brand, but on the basis of more informative labeling—though a few gourmets may retain faith in the brand name as the only dependable clue to style, taste and like subtleties that tickle their palates.

Though the riposte of the defenders of the established federal rule extending trade-mark protection to kindred products may not entirely answer the critical thrusts, the issue seems now to be primarily for Congress and not for the courts. At any rate, inferior federal courts had better follow what has been the orthodox rule. And this is so although the Supreme Court of the United States has never given its imprimatur to that rule (see Judge Learned Hand's comment on Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810, in Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972, 974; and observe the dicta in American Steel Foundries v. Robertson, 269 U.S. 372, 380 lines 1–4, 382 lines 9–14, 46 S. Ct. 160, 70 L.Ed. 317), and there are signs that some of its newer members look upon it with a jaundiced eye. See the dissent in Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 208, 209, 62 S.Ct. 1022, 86 L.Ed. 1381 and the careful reservation of Mr. Justice Frankfurter speaking for the majority, page 205 lines 2–4 of 316 U.S., page 1023 of 62 S.Ct. But perhaps today they would defer to the orthodox rule, not necessarily because they thought it sound, but because it accords with such a long-standing administrative construction of Section 16 of the Trade Mark Act of 1905 by the Commissioner of Patents. American Steel Foundries v. Robertson, 269 U.S. 372, 382, 46 S.Ct. 160, 70 L.Ed. 317.

The question then narrows itself to whether under the orthodox rule of cases like Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A.1918C, 1039 (pancake flour and pancake syrup); Wall v. Rolls Royce of America, Inc., 3 Cir., 4 F.2d 333 (autos and radio tubes); Yale Electric Corp. v. Robertson, 2 Cir., 26 F. 2d 972 (locks and flashlights); and California Fruit Growers Exch. v. Windsor Beverages, 7 Cir., 118 F.2d 149 (fruits and fruit beverages), defendant as an importer, roaster and distributor of coffee and as as an importer, preparer and distributor of tea has a right to protection of the mark White House against its use by plaintiff on apple products, prune juice and sauerkraut products. I lay aside for the moment the point that lapse of time might be a factor in the case.

The following are the chief factors on which defendant relies to show it is entitled to protection with reference to the apple products, prune juice and sauerkraut products in connection with which plaintiff has used the mark White House: Defendant's coffee and tea are sold in the same grocery stores as plaintiff's wares. Coffee, tea, and fruit juices are potables; and all of the products of defendant and plaintiff are served at dining room tables. It is not unknown for a wholesale grocer or grocery chain to market under his special brand the exact variety of groceries here involved, ranging from coffee through canned fruits to fruit juices. Defendant has expended large sums upon advertising White House coffee and tea. The advertising has had such effect that a few purchasers would attribute to defendant any grocery sold under the White House mark; and of these some would buy that grocery more readily on account of the mistaken attribution. Compare A. W. Frey, Manufacturers' Product, Package & Price Policies (1940), pp. 310, 311; Agnew and Haughton, Marketing Policies (1941), pp. 212, 213. It is not unusual for a grocer in his advertisements, order lists and displays to group defendant's products with plaintiff's products under the single rubric, White House.

In my opinion the factors just recited are not conclusive.

That goods are retailed through the same channels is often important. Cf. Restatement, Torts, § 731(d). Yet where the channel is the modern grocery store with its varied array of merchandise drawn from all quarters of the globe, this factor should not be regarded as of much weight. We are told that in republican Germany the presumption that goods bearing the same mark and sold through the same channel would be regarded by the customer as coming from the same source was a presumption not applied to drug stores, department stores and the like because "in

those stores many products are sold which the public knows do not come from the same source." John Wolff, Non-Competing Goods In Trade-Mark Law, 37 Col.L. Rev. 582, 586 note 21. See also pp. 594, 595. And the German rule has special relevance to American grocery stores not merely because standard retailing practice subdivides the stock and, for example, classifies coffees and teas separately from fruit juices and canned fruits, (Alex Todoroff, Food Buying Today, The Grocery Trade Pub. House, 1938, pp. 98-100,101-105), but because experience shows that though the consumer usually buys coffee and tea by brand names he "does not care so much about brands in his purchase of canned fruit * * * jelly" and the like. Hotchkiss and Franken, The Measurement of Advertising Effects, 1927, p. 97. Cf. Restatement, Torts, § 731(g). The point that defendant and plaintiff both market products which go to the consumer's table (Cf. Restatement, Torts, § 731(c) and (e), likewise loses much of its force because of the amplitude of the claim necessarily involved. Carried to its logical extreme it would imply that as soon as they were well known, none of the 150 trade-marks under which coffee is now sold in a typical middle-sized city (Cf. C. H. Sandoge, Advertising Theory and Practice, 1940, p. 382) could be used by others to market any other product which ultimately reaches in any form the dining room table.

The fact that some wholesale grocers now market under the same label coffee, canned fruit and fruit juices does not persuade me that when it started its sales of vinegar, cider and apple products in the first two decades of this century, plaintiff was entering into a field into which defendant as a coffee roaster and tea distributor was then likely to expand. Cf. Restatement, Torts, § 731(b). As a matter of common knowledge, I am aware that the leading coffee roasters, of which defendant was for so long second in volume, did not commonly go into the field of fruits and fruit juices in the first quarter of this century. See the tables at pp. 174, 177–183 in Hotchkiss and Franken, supra. In those days they confined their sales to articles which they themselves prepared or packed and did not use their good name as an umbrella for wares which others prepared and they merely selected. The next factor relied on, that defendant advertised on a huge scale and plaintiff not at all, has only a limited significance, both because it was a traditional difference in advertising expenditure between distributors of coffee and distributors of fruits and juices, based upon established proof of difference in consumer reactions (Id. p. 97; Robert S. Lynd, The People As Consumers, Report of President Hoover's Research Committee on Recent Social Trends In The United States, vol. II, ch. XXII, p. 873 n. 33), and because defendant's rights depend on the claim that prospective purchasers will associate plaintiff's goods with the source of defendant's goods (Cf. Restatement, Torts, § 730(b); Schechter, Historical Foundations of Trade-Mark Law, p. 162-164; Wolff, supra, p. 597), and cannot be derived from the now discredited theory that defendant has standing to complain that plaintiff is taking "a free ride" on the basis of defendant's work. Cf. Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, 281; R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 90.

With respect to the claim that prospective purchasers associate plaintiff's goods with defendant and mistake the true source (Cf. Restatement, Torts, § 731(a), my finding is that the evidence of confusion is surprisingly limited not merely geographically but quantitatively. No attempt, similar to Neil H. Borden's scientific study of Determination of Confusion in Trade-Mark Conflict Cases (Harvard Graduate School of Business Administration, vol. XXIII, No. 8, Dec. 1936, pp. 3–6), was made to show the scientific likelihood of confusion. For its proof defendant relied upon informal tests conducted by retail grocers. Those tests occurred under what seemed to me peculiar conditions that pre-determined the result of the experiments. Moreover, the trickle of complaints received by defendant showed that regardless of theory, actual complaints of confusion were negligible. This is more surprising in view of the period of time that had elapsed since plaintiff first used White House as a mark. Cf. Restatement, Torts, § 731(h).

■ Under all the circumstances I therefore have found as a fact that even under the orthodox federal rule there was no such likelihood of confusion as to the source of plaintiff's products as to warrant issuing an injunction or assessing damages in favor of defendant. In reaching this result I have not relied upon two points

which seem to me material and which, had it been necessary, I should have been prepared to invoke.

First, the trade-mark here involved (the words "White House" and the illustration of the Executive Mansion) has a limited distinctiveness. Cf. Restatement, Torts, § 731(h). It has been used by others for sundry commercial purposes. A large part of its worth depends not upon value contributed by defendant's advertising and labor, but upon unearned increment attributable to the consumer's patriotism. It is true that even an honorific mark could be protected against use on kindred goods. Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46, 48. But the proof that the public associated such a mark with a particular source instead of with a particular quality would need to be clear. See Restatement, Torts, § 731, comment on Clauses (f) and (g) pp. 602, 603. And here I am not persuaded that the public now supposes or ever did suppose that all White House groceries came from the same source as defendant's coffee.

Second, defendant has made no complaint of plaintiff's user until more than a quarter of a century elapsed. Cf. Restatement, Torts, § 751. Defendant's minor agents knew of this user at the outset; and defendant's principal officers have known it for nearly a decade. No protest was uttered until this litigation, when it is offered not as an original complaint but as a counterclaim. Defendant attempts to meet the difficulties in which this delay has enmeshed it by alleging that the running of time does not count where its mark is deliberately copied. Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526. A sufficient answer is that whatever Menendez's case may be worth today (see Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 2 Cir., 105 F.2d 908; Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46; Fruit Industries v. Bisceglia Bros. Corp., 3 Cir., 101 F.2d 752), it has no application where defendant at the outset was selling coffee and tea and plaintiff was selling vinegar and cider and for thirty years defendant made no protest despite knowledge of the use of the mark.

It will be observed from the cases cited in the last paragraph that I have assumed that in determining defenses to, as well as infringement of, a federally registered trade-mark the governing rule is supplied by federal law. See Zlinkoff, supra. If I am mistaken, and rules of local law govern, the result would not be different. Economy Food Products Co. v. Economy Grocery Stores Corp., 281 Mass. 57, 62, 183 N.E. 49; Canadian Club Beverage Co. v. Canadian Club Corp., 268 Mass. 561, 573, 168 N.E. 106.

The next main branch of the case is whether plaintiff has a right to be protected against defendant's use of the mark on the blend of orange and grapefruit juice. Here it becomes necessary to consider both the cause of action for unfair competition and the cause of action for trade-mark infringement. However, it is not necessary to consider profits or damages, since plaintiff has limited itself to seeking an injunction.

As to the cause of action for unfair competition, I must follow the Massachusetts rules of law, see 47 F.Supp. 503, 504, above. I have already noted that in cases of unfair competition the Massachusetts courts apply only Massachusetts principles of tort law even where the competition occurs in several states. Under those principles plaintiff cannot prevail. The bare bones of two cases will make the point plain. Massachusetts has held that a plaintiff who has a trade-mark for paint brushes, shoe brushes and hair brushes cannot prevent a defendant from using the mark on rotary brushes for tanners (John L. Whiting-J. J. Adams Co. v. Adams-White Brush Co., 260 Mass. 137, 139, 142, 156 N.E. 880); and that a plaintiff who has a trade-mark for prints, calicoes and staple cotton dresses cannot prevent a defendant from using the mark on silk or woolen dresses. Hub Dress Mfg. Co. v. Rottenberg, 237 Mass. 281, 283, 129 N.E. 442.

As to the cause of action for trade-mark infringement, the issue, being governed by federal law, is closer. One of the reasons is that defendant in its pleading has gone a very long way to proving plaintiff's case. It has admitted that "orange and grapefruit juices of the defendant are goods of the same descriptive properties" as products of plaintiff. This admission would ordinarily serve to establish plaintiff's right to prevail (Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 322, par. 3, 59 S.Ct. 191, 83 L.Ed. 195; L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 7 Cir., 253 F. 914, 918) and certainly dispenses

with the necessity of elaborate sample studies or other evidence as to public confusion. Moreover, the relationship between plaintiff's apple juice, prune juice and sauerkraut juice and a blended orange and grapefruit juice is incontestably closer than between defendant's coffee, tea and peanuts and blended orange and grapefruit juice. Not only are apple and prune juice, like orange and grapefruit juice, prepared by the same methods, sold at the same stores and used at the same tables, but commonly one serves as a substitute or alternative for the other. I am persuaded that the public would suppose that the blended juice has the same source as plaintiff's juices. Also I am clear that the field of orange and grapefruit juice was one in which plaintiff had already a special interest. This is shown not only by the confusion which existed among prospective purchasers, but by plaintiff's registration No. 336,489 dated July 7, 1936 covering all fruit and vegetable juices for food purposes.

I regard this case as unlike the hypothetical case, put by Judge Learned Hand in Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., 2 Cir., 105 F.2d 908, 910, where, a new market for competition being equally appurtenant to two markets previously occupied by different parties having identical marks, he who first makes actual entry on the new market is allowed to prevail. It might be proper to invoke the maxim, qui prior est tempore potior est jure, if the parties at bar were competing to use the White House mark on a soft drink of say, the so-called "cola" type, which is mid-way between a coffee and a fruit juice. But this principle cannot be applied here since, according to my findings, orange and grapefruit juice is not akin to coffee and tea but is akin to apple juice, prune juice and sauerkraut juice and furthermore, is embraced by plaintiff's registration No. 336,489 which purports to cover all fruit and vegetable juices for food purposes.

Only two considerations might prevent plaintiff from securing an injunction. The first is that the mark White House depends for its efficacy to a large extent on its patriotic and honorific significance. Although some courts have thought this nearly fatal to protection on goods other than those to which the complainant had already affixed the mark (France Milling Co. v. Washburn-Crosby Co., Inc., 2 Cir., 7 F. 2d 304, 306; Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347; Pease v. Scott County Milling Co., D.C., 5 F.2d 524), the later cases, which I shall follow, tend the other way, and make the test, not what the mark is, but whether the public would be confused as to the source. Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46, 48, see page 16 (47 F.Supp. 508) supra. In applying this test, I find that the public would suppose that White House orange and grapefruit juice came from the same source as plaintiff's apple juice, prune juice and sauerkraut juice; and it would not be adequately warned by a difference in the color of the label. Therefore, although the mark is not highly distinctive and wraps itself in the flag, the plaintiff barely brings itself within the orthodox rule for protection.

The other consideration is the one already adverted to: That the Supreme Court may be prepared to refuse its sanction to the doctrine that goods which are so chemically different as blended orange and grapefruit juice, on the one hand, and apple juice or prune juice, on the other hand, are of substantially the same descriptive properties. See 47 F.Supp. 507, supra. But, in the face of existing authorities in the Circuit Courts of Appeals, and the revolutionary effect which such refusal would have upon the present "exchange value" of trademarks, a district judge had better wait until the Supreme Court of the United States speaks more plainly or Congress amends the statute.

Plaintiff's prayer for injunction granted.

Defendant's counterclaim dismissed.