**FOOD FAIR STORES, Inc. v. FOOD FAIR, Inc.**

Civil Action No. 7375.

United States District Court
D. Massachusetts.

Oct. 1, 1948.

446

Arthur L. Sherin, of Boston, Mass., and Stein & Stein, of Union City, N. J., for plaintiff.

Maurice Tobey, of Boston, Mass., for defendant.

WYZANSKI, District Judge.

Plaintiff seeks relief under general principles of tort law and under Mass.St.1947, c. 307, Mass.G.L.(Ter.Ed.) c. 110, § 7A, against defendant's alleged infringement of plaintiff's unregistered trade name, Food Fair.

Plaintiff is a Pennsylvania corporation. It operates a chain of super-markets which sell at retail groceries, provisions, fish, meats, fruits, vegetables and other products customarily sold in food stores. Originally it was incorporated under the name, "Union Premier Food Store, Inc.," and did much of its business through subsidiaries. Thus it organized Food Fair Stores of Maryland to operate super-markets in Maryland commencing in 1935; The Food Fair, Inc., of Pennsylvania to operate super-markets in Pennsylvania commencing in 1938; and Food Fair, Inc., to operate super-markets in Maryland and New Jersey commencing in 1938. In 1938 the first and third subsidiaries merged. In 1942 all plaintiff's subsidiaries merged with plaintiff which then changed its name to Food Fair Stores, Inc.

Thereafter plaintiff added stores not only in Maryland, New Jersey and Pennsylvania but also in Delaware, Florida, New York and West Virginia. This has been a constant growth. Now the super-markets operated by plaintiff number 103 and form the eighth largest retail food chain in the country. At present the annual rate of gross income approaches $150,000,000 and of net income approaches $2,700,000.

As far back as 1935 each of the super-markets operated in Maryland by plaintiff's local subsidiary was called Food Fair. The same name was used from the outset by most of the super-markets operated by plaintiff's subsidiaries or by plaintiff. However, there were some exceptions. In Florida some of the stores were originally called Food Lane, although of those, two changed their names to Food Fair after this suit was brought.

Before plaintiff operated any of its stores the words, "Food Fair" were commonly used as descriptive of casual markets conducted by a community, by an association of sellers or by a church group. Probably prior to 1935, as well as afterwards, they had also been used as a trade name by some concerns operating retail stores in various parts of the country. [See Ex. 15 and Ex. M]

Since 1935 plaintiff has expended in the states where it operates more than $4,000,-000 in advertising its business and stores almost always, except in Florida, under the name Food Fair. These advertisements have, however, all been directed principally at prospective local customers. The advertising media have included newspapers, throw-aways, circulars, street-car cards, trade journals and local radio programs.

In plaintiff's stores many of the items of food sold either are unlabeled or bear the labels of nationally known producers or distributors. However, a substantial number of bottled and canned goods bear labels stating that the merchandise within has been packed for or is being distributed by Food Fair.

Neither in external nor in internal appearance is there uniformity among all the

super-markets operated by plaintiff. There are, however, certain characteristics which repeat themselves in the preponderance of plaintiff's stores as, for example, the plain Egyptian lettering used for the exterior sign on which the name Food Fair appears. Other characteristics of plaintiff's stores which could be mentioned, such as the design of the directional signs in the store, the placing of the inscription Food Fair in terrazzo in the vestibule and the color scheme are somewhat different from what could be found in most modern super-markets.

In April, 1946, one of plaintiff's subsidiaries, Food Fair Stores Corporation, qualified to do business as a foreign corporation in Massachusetts. But neither plaintiff nor its subsidiaries have opened a store or made any sales in this Commonwealth. Negotiations for the acquisition of Massachusetts stores which have begun several times in recent years have proved abortive. But expansion to Massachusetts remains in active contemplation by officers of plaintiff.

The name Food Fair is associated with plaintiff and plaintiff's stores by four groups of persons in Massachusetts:

First, through the listing of the stock of plaintiff's company on the New York Stock Exchange and the daily reports in Massachusetts newspapers of the quotations of that stock and through transactions in which Massachusetts persons have bought and sold that stock, the name is known to and identified with plaintiff by investors and others in financial circles.

Second, through articles and comments in trade journals the name is known to and identified with plaintiff by most of those who operate super-markets, chain grocery stores and like retail outlets.

Third, through purchases of fish and other supplies in this region the name is known to and identified with plaintiff by wholesale suppliers of many types of foods.

Fourth, the name is also known to and identified with plaintiff by some average persons who are prospective Massachusetts customers of retail food stores. This identification would be made by many average persons who had lived in or travelled frequently through the Atlantic states. The exact percentage of average customers who would fall in this category is difficult to estimate. But, as *defendant's* own sampling study shows, 3 out of 76 average customers in Brookline, without being prompted, recalled having seen the name Food Fair and pointed to its use by a store which in fact belonged to plaintiff's chain. From the readiness of the customers' response, from the obvious chain store appearance of each of plaintiff's stores and from the failure of defendant to pursue the inquiry, I infer that these customers regarded Food Fair not only as a name already in use, but as a name in use by a chain, and that they would regard any modern super-market bearing that name as being part of the chain.

So far as it is a question of fact, it follows that plaintiff prior to 1947 had and now has a trade name Food Fair [cf. Restatement, Torts, § 716] used in such a manner that in Massachusetts prospective investors, retailers, wholesalers and a minority of average customers are likely to regard it as the name of and the means of identifying plaintiff's super-markets [Cf. Restatement, Torts, § 727].

Defendant is a Massachusetts corporation which was organized in April, 1947, chiefly by Benjamin B. Rodman. He is now and always has been its chief executive officer, a director and the person principally in charge of corporate operations and policy. Prior to 1947 Rodman had been a market man for a score of years. In that way he first learned of plaintiff. Ten years ago he considered opening his own super-market. At that time one of his consultants suggested a list of possible names. All these were names of existing super-markets or super-market chains. On this list, among other names, were Food Fair and Food Center.

In 1944 or 1945 Rodman engaged an architect to draw plans for a super-market. At that time the proposed name was to be Food Center. In 1947 Rodman, having in mind the list suggested a decade before by the consultant, decided to organize a Massachusetts corporation by the name of Food Fair, Inc., and to have that corporation operate a super-market at a site which he owned on Harvard Street, Brookline, Mas-

sachusetts. The plans for the super-market had been substantially completed prior to April, 1947. In March, 1947, Mr. Rodman's lawyer, Mr. Berger, made application to the Massachusetts Commissioner of Corporations for permission for Mr. Rodman and others to organize defendant. The Commissioner informed Mr. Berger that there was another corporation of a similar name and that (while no notice would be sent) that corporation or any other party believing itself affected would have thirty days to object to the application filed by Mr. Berger. No such objection was in fact made, and indeed there is no evidence that plaintiff knew of the application before it was acted upon.

After defendant corporation was organized, Rodman continued discussions with his architect Wexler. Together they went in the early summer of 1947 to visit various super-markets outside of New England. One of the markets they visited was plaintiff's Food Fair at 5220 City Line Avenue, Philadelphia. The two men were there for half an hour. And on leaving they discussed some features of the layout of the store and its internal and external appearance. But the visit and the discussion did not result in any significant change of the plans theretofore made for the Harvard Street store.

In December, 1947, defendant began to operate the store on Harvard Street of which complaint is made. Defendant called the store Food Fair. It bore a sign in plain large Egyptian lettering similar to that used in the newer stores of plaintiff. On the outside and inside the store resembled most of the super-markets built in recent years. But the resemblance (except in the color of the paint on the interior) was not strikingly closer to plaintiff's stores than to the stores of many other companies.

Virtually none of defendant's merchandise indicated that it was produced by, packed for or specially prepared for defendant. However, of the more than 3500 different items offered for sale a substantial number did bear tags which showed both the name Food Fair and the price of the merchandise. When these goods were delivered to customers, the defendant's store frequently used a truck which bore the lettering Food Fair.

Defendant, so far as appears, enjoys an excellent reputation with its customers and suppliers. Its credit standing with its suppliers is excellent.

While some wholesalers were initially confused to the point of inquiring whether the Harvard Street store was operated by plaintiff, no wholesaler, no retailer and no investor was sufficiently confused to complete a transaction with defendant under the mistaken belief its store was operated by plaintiff. Some ordinarily attentive customers, probably no more than 3 to 5 per cent of the total, were led to believe that defendant's store was operated by plaintiff as part of its chain.

The first problem presented by these facts is whether this Court has jurisdiction of the controversy. In this case there is no issue involving a federally registered trademark. And the sole claim to federal jurisdiction rests on the stipulation that there is between the parties diversity of citizenship and on plaintiff's disputed allegation that the amount in controversy exceeds $3,000 exclusive of interest and costs. 28 U.S.C.A. § 41(1) [now § 1332]. Since the question whether this amount is indeed at stake is intermingled with questions which go to the merits of the case, it must be temporarily postponed.

If the Court has jurisdiction, the next problem is to decide what is the governing law. The complaint relies upon a single cause of action founded upon general principles of tort law and upon a Massachusetts statute. Thus the cause of action is neither dependent on a federal substantive statute nor [as was the case in National Fruit Product Co. v. Dwinnell-Wright Co., D.C. Mass., 47 F.Supp. 499, affirmed 1 Cir., 140 F.2d 618] pendent to a cause of action founded on a federal substantive statute. Moreover, defendant's action in establishing a store occurred in Massachusetts and, so far as the evidence discloses, had no effect outside of Massachusetts.

Under these circumstances the "choice of law" problem is as simple as if plaintiff had brought before a federal court upon a diversity jurisdiction basis a suit

to recover damages inflicted by a negligent automobile driver who injured plaintiff in Massachusetts. The court first turns to Massachusetts conflict rules to see which substantive law the state courts would apply [Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477] and then finds that the Massachusetts court would apply Massachusetts substantive law to a controversy involving local conduct which had an exclusively local impact. Strogoff v. Motor Sales Co., Inc., 302 Mass. 345, 347, 18 N.E.2d 1016. Folmer Graflex Corp. v. Graphic Photo Service, D.C. Mass., 44 F.Supp. 429. Note, 60 Harv. L. Rev. 1315, 1318, n. 32.

Before analyzing and applying the Massachusetts substantive law it is important to review the dominant facts of this controversy.

Plaintiff relies on a trade name which is composed of two ordinary words. They are presented in a combination long familiar in everyday vocabulary and frequently used as descriptive of casual markets conducted by a community, by an association of sellers or by a church group. But prior to plaintiff's use the combination had rarely been identified with a permanent grocery store or stores conducted for profit by a single concern. As a result of plaintiff's use the combination Food Fair has now acquired a secondary meaning sufficient to deserve protection as a trade name. It signifies local retail super-markets operated by plaintiff. This identification is made not only by persons residing outside Massachusetts but by an appreciable number of persons within Massachusetts. In the latter group are investors, market operators, wholesalers and a very small percentage of prospective or actual customers of Brookline supermarkets. None of those customers would or conveniently could patronize plaintiff's stores at the present time. However, from the facts that one of plaintiff's subsidiaries qualified to do business here, that plaintiff is a rapidly expanding chain and that plaintiff has seriously and recently considered Massachusetts sites, it is reasonable to conclude that in the near future plaintiff will establish a Massachusetts store or stores that will seek their custom. Defendant uses precisely the same combination of words. It uses the combination upon precisely the same class of enterprise—a local retail super-market. The defendant presents the name Food Fair in lettering of virtually the type used by plaintiff. In choosing the title and lettering defendant acted on the correct assumption that customers frequently select markets on the basis of the name of the concern.

Moreover, defendant adopted the name Food Fair with knowledge of plaintiff's earlier use and knowledge of the expanding character of plaintiff's chain. However, defendant's intention was chiefly to get the benefit of a name which was inherently attractive because of its primary rather than its secondary meaning.

The effect of defendant's conduct has not been to deprive plaintiff of a single customer; nor to affect its standing with investors or wholesalers; nor to affect the worth of the name outside Massachusetts, where so far as appears the name of defendant's store has never reached.

However, defendant in the past has confused a few average customers and in the future is likely to confuse some average customers into believing they were dealing with plaintiff's chain. So far as appears, those customers who were confused did not receive goods or services inferior to what they anticipated. Hence, to date they have not been injured by their confusion nor has plaintiff's reputation been affected by being associated with inferior goods or services. Confusion has not extended to and is not likely to extend to any wholesaler or investor to the point of leading him to consummate a transaction under the belief that defendant is associated with plaintiff.

One other effect of defendant's conduct demands special notice. Defendant to some extent diluted the value of plaintiff's trade name within Massachusetts. Prior to defendant's advent the name carried to some actual or potential Massachusetts customers, retailers, wholesalers and investors the meaning that all super-markets operated under that name belonged to plaintiff. Defendant's conduct has adversely affected that exclusive secondary meaning. The extent of the adverse effect is a more

subtle question to which reference will be made later.

On the facts found, it is my opinion that prior to Mass. St. 1947, c. 307, it is doubtful whether plaintiff was entitled to injunctive relief on the ground that wholesalers, retailers, investors and only a few customers using ordinary care had been or probably would be deceived as to the ownership of defendant's store and would be confused into believing it belonged to plaintiff. Perhaps plaintiff could succeed on the basis of the more recent Massachusetts cases such as Jays, Inc., v. Jay Originals, Inc., 321 Mass. 737, 75 N.E.2d 514; Jays, Inc., v. Purcell, 313 Mass. 127, 46 N.E.2d 556. See 265 Tremont Street, Inc., v. Hamilburg, 321 Mass. 353, 357, 73 N.E.2d 828; Healer v. Bloomberg Bros., Inc., 321 Mass. 476, 73 N.E.2d 895 and the recent federal cases interpreting Massachusetts law, Brass Rail, Inc., v. Ye Brass Rail of Massachusetts, Inc., D. C. Mass., 43 F.Supp. 671, as well as authorities stating what purports to be the soundest law of all jurisdictions. See Restatement, Torts, c. 35, especially § 717.

But regardless of the earlier law it seems to me that plaintiff is entitled to relief under Mass. St. 1947, c. 307 [Mass. G. L. (Ter.Ed.) c. 110, § 7A], which provides that: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a trade name or trademark shall be a ground for injunctive relief in cases of trade-mark infringement or unfair competition notwithstanding the absence of competition between the parties or of confusion as to source of goods or services."

In construing this Massachusetts legislation this Court obviously must follow Massachusetts state rules of statutory construction. While less latitudinarian than the federal practice, the state court always considers the mischief or imperfection in pre-existing law apparently intended to be remedied by the statute. City of Boston v. Quincy Market Cold Storage & Warehouse Co., 312 Mass. 638, 643, 45 N.E.2d 959. And it has often shown a willingness to consider "the progression" of a statute "through the legislative body". Commonwealth v. Welosky, 276 Mass. 398, 401, 402, 177 N.E. 656, 658. Pacific Wool Growers

v. Commissioner, 305 Mass. 197, 199, 25 N.E.2d 208. It is doubtful, however, whether the state courts would follow federal cases taking into account the specific arguments which proponents of the legislation advanced in its support before legislative bodies. Cf. Shapiro v. United States, 335 U.S. 1, 12, 15, 68 S.Ct. 1375; Securities Exchange Comm. v. Robert Collier & Co., 2 Cir., 76 F.2d 939.

Applying the state canons of construction to the statute at bar, this Court is entitled to take into account that prior to 1947 Massachusetts state courts were not inclined to give such broad protection as most courts did to holders of trade names and trade-marks against use of their symbols by strangers not in direct competition. See authorities cited in National Fruit Product Co. v. Dwinell-Wright Co., D.C.Mass., 47 F.Supp. 499. Numerous text writers and specialists in the field regarded this as mischievous, and while others dissented as appears from the recent comprehensive article by Prof. Ralph S. Brown, Jr., Advertising and The Public Interest, 57 Yale L.J. 1165, the 1947 Massachusetts legislature apparently accepted the views of those who thought the judicial decisions of Massachusetts courts on unfair competition fell short of what was desirable. This conclusion as to the attitude of the legislature is apparent on the face of the statute. And it is nowhere rebutted. For there is no written record preserved of the hearings conducted by any Massachusetts legislative committee considering the bills that led up to the 1947 act. Nor is there a committee report or a record of a legislative debate. All that is available is the statement presented to some legislators by a learned member of the Boston bar, Mr. Joseph P. Healey, a proponent and draftsman of the legislation, who was called as a witness in this case by the Court, not the parties. While on reflection I have concluded that his testimony is not admissible as evidence, I may note that it supports the view that the Massachusetts legislature was trying to bring Massachusetts local law into line with federal cases.

If we turn now to the statute itself, the first point to be observed is that it is cast in the form of a procedural innova-

tion. A new "ground for injunction" is given. Despite the form, however, the law was designed to create and does create new substantive rights. Such rights are cognizable in any court, state or federal. Guaranty Trust Co. v. York, 326 U.S. 99, 106, note 3, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231. Whether these rights are subject to remedy not only by injunction but also by damages is an issue which I need not and do not decide. It is enough now to say that they are not only subject to vindication by injunction but also have a value subject to appraisal by a federal court seeking to determine the amount in controversy for federal jurisdictional purposes.

■■ The first of these two new substantive rights is protection against "likelihood of injury to business reputation." If one were to read that phrase without any acquaintance with the prior case law and the mischief sought to be remedied, it would be possible to construe it as affording protection only in a case where it was probable that defendant would render inferior services or sell inferior goods which would make customers think less of plaintiff. That is, plaintiff would be required to show—what has not been shown at bar—that defendant's services or goods were below plaintiff's standard. Cf. Frank, J., concurring in Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 43, commented on by Ralph S. Brown, Jr., supra, 57 Yale L. J. at 1194. But such a literal reading is not warranted because the statute was obviously designed to make the Massachusetts law go at least as far as the unfair competition rules laid down in federal courts before the Erie case [Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487] and as far as the Restatement of Torts. See Note, 27 B. U. Law Rev. 489, 492. And under those rules it was settled that "if another uses" the trade name of plaintiff, "he borrows the owner's *reputation,* whose quality no longer lies within his own control. This is *an injury,* even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask." Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972, 974. (Emphasis added.) This protection of reputation against even the highest grade of unauthorized borrowers was not always limited to a state where plaintiff did business, as the comment to Restatement, Torts, § 732 pointed out: "A State may * * * recognize and protect a trademark [and presumably a trade name] against infringement within its borders before the trade-mark is used in the State, if the trade-mark has acquired a reputation elsewhere and * * * custom in the State may reasonably be expected." Accordingly, I am of the view that the first clause of the statute operates to warrant relief against this defendant's use of plaintiff's trade name on defendant's store even though plaintiff does no business here, even though defendant's store is of premier quality and even though only a few average customers would be confused. The Pep Boys, etc., v. Pilavin,[1] D.C.Mass.

■ The second new substantive right is also applicable. It accords protection against "likelihood of dilution of the distinctive quality of a trade name." The position in this phrase of the adjective "distinctive" shows that what is protected is not merely a distinctive trade name such as a coined word but also the essential or characteristic quality inherent in any valid trade name after it has acquired a distinct secondary meaning. But see Brown, supra, 57 Yale L. J. at 1194, note 121. How far that protection goes I need not decide; and I expressly avoid passing on problems that would be raised if an outsider used plaintiff's trade name in such a way that with respect to customers, retailers, wholesalers and investors there was absolutely no "likelihood of deception" [see 265 Tremont Street, Inc., v. Hamilburg, 321 Mass. 353, 357, 73 N.E.2d 828, 831], or used it on goods or services unrelated to supermarkets.

Defendant urges the point that the statute should not be applied because to do so would make it retroactive. But the statute was enacted many months before defendant opened its store and poached upon the commercial magnetism of the symbol plain-

---

[1] No opinion for publication.

tiff had created. Hence, there is no valid factual basis for asserting that the statute is retrospective.

Having decided that under applicable Massachusetts law plaintiff has a substantive right to a trade name which has been infringed by defendant, I now return to the difficult question as to whether the amount in controversy is in excess of $3,000 so as to satisfy the jurisdictional statute governing United States District Courts.

■ The appropriate method of calculating jurisdictional amount in cases of trade-mark and trade name infringement has been stated by Judge Charles E. Clark in Pure Oil Co. v. Puritan Oil Co., Inc., D. C. Conn., 39 F.Supp. 68 reversed on another ground in 2 Cir., 127 F.2d 6. I accept his reasoning though I am aware it contradicts at least dicta in opinions such as Beneficial Industrial Loan Corp. v. Kline, 8 Cir., 132 F.2d 520, 525, and Wisconsin Electric Co. v. Dumore Co., 6 Cir., 35 F.2d 555, 556, 557.

As Judge Clark observes, the measure of the jurisdictional amount is not necessarily or usually the value of plaintiff's mark. It is the injury, present and prospective, inflicted upon that mark by defendant's conduct. This broad principle requires some discrimination in its application to the case at bar.

Defendant's store is not, and probably never will be, known outside Massachusetts. Hence, it is only within this Commonwealth that it has inflicted or will inflict damage.

In this territory it has already caused some persons to be confused but, since their trade was not diverted from plaintiff, and since defendant's services have not been and are not likely to be inferior to plaintiff's, such damage was merely nominal. Cf. Pure Oil Co. v. Puritan Oil Co., Inc., supra, 36 F.Supp. at page 71.

■ But there remains one other aspect of the amount in controversy. Defendant has interfered with plaintiff's opportunity to expand its chain by opening stores in Massachusetts free of competition with other local stores by the same name and has created a situation where, if it now prevails, it will probably be able even to enjoin plaintiff from effectuating its plans to operate stores in Greater Boston under the name Food Fair. This interference and forestalling, unlike that considered in United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 101, 39 S.Ct. 48, 63 L.Ed. 141, and Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 420, 36 S.Ct. 357, 60 L.Ed. 713, occurred after plaintiff had acquired a reputation in Massachusetts, had done business with wholesalers here, had acquired official permission for one of its subsidiaries to do business here and had negotiated for the acquisition of enterprises here. Before defendant opened its store plaintiff had something more than a mere hope of doing business in Massachusetts. Plaintiff had a right to regard Massachusetts as the "territory from which he * * * with the probable expansion of his business may reasonably expect to receive custom * * *." Restatement, Torts, § 732. Cf. Sweet Sixteen Co. v. Sweet "16" Shop, 8 Cir., 15 F.2d 920. The right to protection in territories where one "receives or with the probable expansion of his business may reasonably expect to receive custom" [Restatement, Torts, § 732] is protected by Mass.St.1947, c. 307, from dilution. And thus (to use the language familiar in federal jurisdictional law) the value of the object to be gained in this suit is the right to operate supermarkets in Massachusetts under the name Food Fair without being faced with a competitor in Brookline who has the same name and who probably would seek to enjoin plaintiff's expansion. In view of the testimony that with 103 stores plaintiff earns at the rate of $2,700,000 annually, this right, it seems to me, could reasonably be thought to exceed $3,000. And I therefore conclude that this Court has jurisdiction to give relief to plaintiff.

■ There is left the question as to the scope of the relief to which plaintiff is entitled. There is no evidence to warrant an award on account of damages or profits. And in the light of the lack of originality of plaintiff's trade name and the fact that the confusion of customers and others can be dissipated by small alterations in the symbol, I direct that an injunction shall issue which while it prohibits defendant from using the words Food Fair sim-

pliciter leaves defendant free to use the two words if it *prefaces* them by as distinctive a first word as the name of the chief officer of defendant or the name of the town, so that the enterprise is called something like Rodman's Food Fair or Brookline Food Fair.