FOOD FAIR STORES, Inc. v. SQUARE
LEAL MARKET CO., Inc.
Civ. A. 1090–48.

United States District Court
District of Columbia.
June 25, 1952.

Max O'Rell Truitt, Edward H. Miller and Cary McN. Euwer, Washington, D. C., for plaintiff.

Buckley & Danzansky and Bernard Margolius, Washington, D. C., for defendant.

McGUIRE, District Judge.

The plaintiff is a Pennsylvania corporation which operates a large chain of supermarkets which sell at retail, groceries, provisions, etc.—products usually sold in food stores. It was originally incorporated in 1933 under the name of "Union Premium Food Store". In August 1935 it organized a subsidiary "Food Fair Stores of Maryland" for the purpose of operating supermarkets in that state, and on October 31, 1935 opened such a market in Baltimore under the name "Food Fair". It continued to open other stores so named until today it operates approximately 151 such markets throughout certain of the eastern states (Pennsylvania, New Jersey, Maryland, Delaware and New York).

The defendant is a Delaware corporation which operates a smaller chain in the District of Columbia, including one store each in Montgomery and Prince George's Counties. Presently the chain consists of twelve stores. Previous to 1936 it had opened a small number of retail food stores in the District under different names.

Indeed there is evidence that both the plaintiff and the defendant, while operating their stores under the name "Food Fair" in the early days of their expansion, operated other stores under other names at least until 1942. It was during the period 1940 until the present that both chains began their rather significant growth.

On March 19, 1936 the defendant opened its first store called "Food Fair" at 1420–1422 7th Street N.W. and advertised this fact in the papers.

This litigation has arisen out of the use by the defendant of the name, which the plaintiff claims operates to the disadvantage of its business activities, in that it is an intentional usurpation and causes confusion among patrons, the public and suppliers, particularly where such usurpation by the defendant is in an area contiguous to its Baltimore market.

First of all with reference to the name itself, neither the plaintiff nor defendant could have registered it under the trademark statute. Any proprietary right in the same would have of necessity to be predicated upon its acquiring a secondary meaning peculiarly concerned and connected with its use by either of the parties, distinguishing their operations from all others of a similar character.

The burden of proof is therefore upon the plaintiff to establish by the preponderance of the evidence that it has met this basic requirement necessary to establish this right.

I conclude upon all the evidence that while undoubtedly such a right in the use of the name was acquired by the plaintiff in the area in which it operates, yet nevertheless no such right pertains to it in the District of Columbia nor in its immediate vicinity, and that there was not any usurpation intentional or otherwise of the name by the defendant in the District of Columbia.

Defendant was using the name, certainly at the very beginning of 1936 when the premises located at 1420–22 7th Street N.W. were leased and renovated. The lease for these premises was negotiated December 23, 1935 to be effective January 1, 1936.

On April 17, 1936 plaintiff wrote a letter (plaintiff's Exhibit "28") to the defendant which purported to put the defendant on notice with reference to the use of the name by the defendant and threatening suit. Further, there is testimony to the effect that this letter, addressed as it was exclusively to the defendant in relation to the defendant's use of the name in the Washington area, was of like tenor with others which the plaintiff had sent out to the other alleged users of the name generally. The defendant immediately replied through counsel (plaintiff's Exhibit "28") denying and challenging plaintiff's asserted right (id), and from that date until the filing of this suit on March 17, 1948 the plaintiff did nothing whatever regarding enforcement of its alleged right. By so doing they manifested a lack of interest certainly in its use by the defendant if that use was wrongful

and usurpative. Indeed they not only did so, but apparently assumed that the defendant's position was tenable by not only purporting or electing to do nothing about it but to do business in the District of Columbia trading area by opening up two stores, one in Virginia and the other in Maryland, contiguous to the Washington area, under an entirely different name, to-wit: "Food Lane". Certainly it cannot be argued with any degree of cogency that there can be any proprietary interest in the word "Food".

Although, the witness testified (T. 142) they were looking for outlets in Washington as far back as 1936, they elected to do nothing about defendant's use of the name until March 1948 when suit was filed. And further (T. 142) from 1936 to date " * * we have constantly searched for locations within the confines of our policy limitations on acquisitions of that kind", in 1940 making an effort to buy out the Giant combine —the deal for some unknown reason falling through (id).

Evidence was also introduced on behalf of the plaintiff consisting of the deposition of one Charles Pisner, at one time an officer and indeed the chief stockholder of the defendant, to the effect that he, Pisner, had appropriated the name "Food Fair" as a consequence of a visit to Baltimore to view the plaintiff's operations there. I am not impressed by this testimony. Pisner apparently is a disgruntled and embittered man—and hostile to the present officers of defendant. (Deposition of Pisner, p. 55.)

It would seem to be a fair inference, and I so conclude, that as a matter of fact both the plaintiff and the defendant had hit upon the use of the name "Food Fair" at approximately the same time but there was not immediately any concentrated exploitation of it, both parties continuing to use other names to designate the stores under their control until apparently, the name having caught public fancy, both then contemporaneously started to exploit it. This being the fact it is clear plaintiff has failed to prove by the preponderance of the evidence that the name was exclusively devised by it and, as a consequence, exploited by it anywhere, except as has been said.

The testimony of the witness Marcus gave the distinct impression and indeed the court drew the inference, that the lost interest in the use of the name by the defendant remained such until it was suddenly revived by the expansion of the plaintiff's operations further south and the consequent stimulation of the desire to push a successful enterprise as far as it could successfully go, and particularly into the lush area of the District of Columbia and its environs. That the District of Columbia was an area which had been a recognized barrier of grave import to the plaintiff's expansive desires is evidenced by its exhibit 20 purporting to be an excerpt from an article appearing in Fortune Magazine for June 1950 entitled "Food Fair Supermarkets" on the origin and development of the plaintiff's business. It states that a Florida store group had been established by the plaintiff "which still has some way to go before it contributes its share to the chain's net. It would have been easier to expand the chain in adjacent areas, where existing warehousing, supervision, etc., might have served the new units at little added expense. (However, one potential expansion area—Washington, D. C.—*is a special problem because a local chain has preempted the name Food Fair.*) (Italics supplied). The Florida expansion was undertaken nevertheless, probably because of national ambitions that once led the company to consider buying chains in Detroit and Los Angeles."

In the court's opinion it is this ambition also that has led to the effort to force out of competition in this area the defendant and to leave it exclusively to the exploitation of the plaintiffs. The difficulty however is that the defendant was first on the ground, a fact the plaintiff was aware of certainly since 1936.

Obviously it cannot be claimed that the idea of a supermarket or that of special insignia denoting the same, or the other indicia such as self-service, etc., was the original idea of the plaintiff. True, they started the use of towers in 1945 to denote their

stores of the supermarket type, but these were used by others in certain parts of the country and had been used for a substantial period of time. The plaintiff's Virginia store was opened in 1946 and, as indicated, was called "Food Lane" as was the Prince George County store despite the Company's policy, in the opening of new stores, to call them "Food Fair". There is only one conclusion to be drawn from this, and that is that as far as the District of Columbia is concerned it was an admission on its part that the use of the name in this area had been preempted by the defendant. This was known to it certainly for at least two years before the opening of the 1946 stores and, as has been indicated, it had been called to its attention as far back as 1936, when its letter of warning to the defendant not to operate an enterprise of that character under that name was communicated to them.

Nor can it be argued successfully that since there are some few stockholders of the plaintiff in the Washington area, that the name Food Fair is as a consequence exclusively associated by them with plaintiff—nor indeed would people by virtue of this fact regard any modern supermarket bearing that name as being part of its chain, when there has been for some years a chain doing business here with which the name has been identified.

The fact, if it is a fact, that people traveling frequently through or living in the Atlantic states would identify the name Food Fair with the activities of the plaintiff affords no warrant for striking down its use by the defendant and forcing it out of business, small no doubt in comparison with the operations of the plaintiff, but which has been laboriously built up by it over the years.

New York Stock Exchange quotations are not published only in the Atlantic area, and although there was no evidence indicating such, it is a fair inference that since the plaintiff has become a national chain, it has stockholders scattered over a wide area throughout the country; and if this is so, then any operation no matter how small or isolated it may be and no matter how far removed from the scene of the plaintiff's concentrated activities, on this theory falls also for the same reason.

Many retail food stores and casual stores undoubtedly have used this name long before either the plaintiff or defendant and perhaps some still do, whose activities however do not in any way affect, because of their size and scattered character, the plaintiff—yet who would however, under the same reasoning sought to be applied here, also fall victim of the plaintiff's claim of absolute and exclusive control of name, which it regards as its exclusive property—rightly so in the area in which its operations were begun and are presently confined, but which if their contention here is sound, a control they would like to extend throughout the Nation, despite the fact that according to the evidence there are stores using the name in Michigan, North Carolina, Ohio, Indiana and Texas.

Food Fair Stores v. Food Fair, D.C., 83 F.Supp. 445, 449 can be distinguished. In that case the defendant corporation was organized in April 1947 for the purpose of doing business in the Commonwealth of Massachusetts, while the year previous the plaintiff qualified to do business as a foreign corporation in that state. Although neither it nor its subsidiaries had opened a store or made any sales in that Commonwealth, expansion of the plaintiff's operations in that area was actively contemplated. Mass.St.1947, C. 307, Mass.G.L. (Ter.Ed.) C. 110, § 7a. The Court applied the above cited Massachusetts substantive law and found that "defendant adopted the name Food Fair with knowledge of plaintiff's earlier use and knowledge of the expanding character of plaintiff's chain" and that "defendant's intention was chiefly to get the benefit of a name which was inherently attractive because of its primary rather than its secondary meaning." Yet the court in that case instead of recognizing in the plaintiff, under the circumstances there disclosed, an exclusive, preemptive right, left the defendant "free to use the two words if it *prefaces* (italics) them by as distinctive a first word as the name of the chief officer * * * or the name of the town * * *". 83 F.Supp. at page 453.

In this case the defendant was already on the ground and in an area where the plaintiff had not as yet made its appearance.

Since the plaintiff acquired no legal right with respect to the name in this area, the complaint should be and is dismissed. And even assuming arguendo such a right in this area might have been established in the plaintiff by its timely assertion of same, it would be barred under the present circumstances from asserting it by virtue of its long acquiescence in an adverse use when first confronted with it, years ago.

This memorandum opinion may serve as findings of fact and conclusions of law.

Counsel will prepare proper order.