FOOD CENTER, INC., et al., Plaintiffs,
Appellants,

v.

FOOD FAIR STORES, INC., et al.,
Defendants, Appellees.

FOOD FAIR STORES, INC., et al.,
Defendants, Appellants,

v.

FOOD CENTER, INC., et al., Plaintiffs,
Appellees.

Nos. 6605, 6606.

United States Court of Appeals
First Circuit.

Heard Dec. 6, 1965.

Decided March 4, 1966.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

The plaintiffs are corporations carrying on a retail supermarket grocery business in Massachusetts under the name "New England Food Fair". The defendant corporations operate the nation's fifth largest chain of grocery supermarkets under the name "Food Fair" in fifteen states, but not yet in Massachusetts. Plaintiffs seek to enjoin defendants from operating under the name "Food Fair" in "the Massachusetts area" and defendants by counterclaim seek to enjoin plaintiffs from using the words "Food Fair" in their name. The district judge dismissed both complaint and counterclaim in a memorandum opinion dated July 2, 1965, and both parties appeal.

This is actually Chapter Two of litigation commenced in Food Fair Stores, Inc. v. Food Fair, Inc., D.Mass., 1948, 83 F.Supp. 445, aff'd, 1 Cir., 1949, 177 F.2d 177.[1] This earlier litigation necessarily is part of the facts relevant to the case before us. In this earlier proceeding Food Fair commenced the action. It had organized "Food Fair" supermarkets since 1935 and, by 1948, was operating 103 such units in seven states,[2] being the eighth largest retail food chain in the nation, with annual sales of $150,000,000. It had not acquired any stores in Massachusetts although negotiations had been attempted, but expanding to Massachusetts was "in active contemplation".

New England had been organized in 1947 by Benjamin B. Rodman, a veteran market man, who decided to build a supermarket in Brookline, Massachusetts. He was aware of Food Fair's operations and chose the name "Food Fair" for his store from a list prepared by a consultant in 1937, two years after Food Fair had first used this name.

Frank L. Kozol, Boston, Mass., with whom Joel A. Kozol and Friedman, Atherton, Sisson & Kozol, Boston, Mass., were on brief, for Food Center, Inc. and others.

James P. Lynch, Jr., Boston, Mass., with whom Nutter, McClennen & Fish, Boston, Mass., and Stein, Abrams & Rosen, New York City, were on brief, for Food Fair Stores, Inc. and others.

1. For convenience, the present plaintiffs and the defendant in this earlier action will be referred to as "New England". The plaintiff in the earlier action and the present defendants will be referred to as "Food Fair".

2. Maryland (1935); New Jersey and Pennsylvania (1938); and, thereafter, in Delaware, Florida, New York, and West Virginia (prior to 1948). See footnote 4, infra, for expansion subsequent to 1948.

The district court, in 1948, found the following facts: (1) that, despite the use of two ordinary words in familiar combination, enough promotional, publicity, investment, purchasing and other activity had taken place to give the name, even in Massachusetts, a secondary meaning, sufficient to protect it as a trade name; (2) that Food Fair would "in the near future" establish a store in Massachusetts and that Massachusetts was within the territory of its probable expansion; (3) that Rodman, while knowing of Food Fair's prior use of the name, chose it for his operations for its inherent attractiveness rather than from any desire to gain advantage from such secondary meaning as the larger company had created; (4) that, while there was presently no competition between the parties, no adverse effect on Food Fair's reputation in view of New England's own high quality store, and very little confusion among customers, the Massachusetts anti-dilution statute applied and gave grounds for injunctive relief.[3]

The court's conclusion "in the light of the lack of originality of plaintiff's trade name and the fact that the confusion of customers and others can be dissipated by small alterations in the symbol" was that New England should be barred from using the words "Food Fair" unless it coupled them with a distinguishing preface. The decree suggested "Rodman's", "Brookline", or "New England". The defendant chose "New England" and has used it ever since.

On appeal, this court, in 1949, 177 F.2d 177, affirmed the decree, noting that the words in the trade name were not too weak to deserve the protection given and that inherent chancery jurisdiction reserves the power to alter the decree should changing circumstances convert it into an instrument of wrong.

The activities of the parties in the intervening years may be summarized in terms of present size and scope, expansion, promotion, and protection.

Food Fair has, since 1948, grown from the nation's eighth largest grocery supermarket chain to the fifth largest, with sales volume increasing from $150 million to $1,100 million and numbers of Food Fair stores increasing from 103 to about 500. It has added eight new states to the seven as of 1948.[4] New England has expanded from one supermarket in 1948, to three (two in Brookline, one in Danvers), a liquor store in Boston, and a warehouse.[5] Since 1956 (when data for all its stores first became available on a yearly basis), New England's employees have doubled from 203, to 416 in 1964; sales have more than doubled in the same period, rising from $4,831,469 to $10,997,347. Mr. and Mrs. Rodman are New England's principal stockholders. Food Fair has in excess of 18,000 common stockholders of whom almost 400 are Massachusetts residents.

Food Fair's expansionist activity in Massachusetts since the prior case has consisted of some one hundred explorations for store sites commencing in 1956, several abortive negotiations, and the permanent acquisition of a site in Westfield (1960) and one in Springfield (1961). The sites have been razed of existing structures and levelled; plans have been drawn; but construction has not been commenced. After Food Fair acquired the J. M. Fields chain of 33 discount department stores in 1961 (11 in Massachusetts), one food department selling its products was established in the

---

3. Mass. Acts 1947, c. 307 [Mass.G.L. (Ter. Ed.) c. 110, § 7A]: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a trade name or trade-mark shall be a ground for injunctive relief in cases of trade-mark infringement or unfair competition notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services."

4. Connecticut (1955); Georgia, Virginia, and Tennessee (1957); Rhode Island (1960); South Carolina (1963); California and Nevada (1964).

5. New England's warehouse has 84,000 square feet capacity, with a pending addition of 17,000 square feet, and 200,000 square feet of land for possible future use.

Medford J. M. Fields store in 1964. Food Fair's nearest warehouse is in Linden, New Jersey. While it is possible for this warehouse to service several stores in Massachusetts, Food Fair acknowledges that the difficulty of servicing stores north of Rhode Island is a disadvantage, and that it will not construct any supermarkets until it assembles a complete package of at least five or six stores in an area. Alternative courses are to establish supermarkets alongside or inside J. M. Fields stores, to acquire another chain with its own warehouse, or to establish enough stores (25 to 30) to justify a new warehouse. The timing of opening Food Fair supermarkets in Massachusetts is accordingly contingent on a number of factors.

Before and since 1948, Food Fair has sold meat, principally kosher, under its own label to distributors in Massachusetts.

As for New England, apart from the expansion above noted, it has engaged in negotiations and explorations concerning five Massachusetts locations and one location in New Hampshire.

The promotional activity of Food Fair has been extensive on a nationwide basis. It has spent some $50 million on advertising since 1948, although admittedly less than $1,000 a year in media originating in Massachusetts. Many national publications, trade journals, and financial bulletins have carried stories about its operations. New England has promoted its stores through newspapers, direct mail, and radio in Boston and elsewhere in eastern Massachusetts, its total advertising expense ranging from $122,569 in 1956 to $196,589 in 1964. Within the past two years, it has withdrawn from the use of trading stamps and has embarked on a discount food operation, adding the name "BI-LO" to signs, sponsoring newspaper advertising under the name of "BI-LO Foods, Division of New England Food Fair Stores", labelling much of its food products with the term "BI-LO", either alone or with "New England Food Fair", and providing customers with sacks bearing the label "BI-LO".

The newspaper advertising, food labels, and customer sacks give dominant position to the term "BI-LO". While the store signs still give dominant effect to "New England Food Fair", a leading supermarket competitor felt that stress on "BI-LO" was now "the emphasis" of New England.

Both parties have been alert in protecting their names. Food Fair maintains a systematic program of protection, including the gathering of information, investigation, the sending of "desist" letters, and litigation, with suits having been brought in at least six states. New England has caused its attorneys to take action in three instances to prevent other Massachusetts firms from using "Food Fair" in their name, in each matter being successful.

As to confusion between New England and Food Fair, perhaps because both sides admit its probability in their pleadings, the evidence as to existing confusion is extremely sparse. Only one consumer witness appeared, giving inconclusive testimony. While admittedly not very relevant to the primary objective of avoiding consumer confusion, there was evidence that in 1962 New England received only five pieces of mail from business firms intended for Food Fair.

In summary, the facts show two aggressive enterprises, one large, the other small, both with a record of past expansion and continuing probings as to future possibilities, each seeking to protect its name from encroachment by others, and each seeking to divest the other of the right to use the words "Food Fair" in Massachusetts, with little evidence as to existing confusion but with both parties admitting the "reasonable probability" of future customer confusion.

The district court, in its recent decree, held that plaintiffs' name "New England Food Fair" is a trade name with a secondary meaning "in Greater Boston, in Danvers, and to some extent in other parts of Eastern Massachusetts" while Food Fair's reputation in Massachusetts, existent before, has increased over the past decade and a half, establishing

a secondary meaning among producers, consumers, competitors, and investors. It further found that while New England lacks the resources, business capacity, and firm determination in the immediate future to enter into fresh territory, Food Fair has the resources, ability, and will "presently, not in the distant future, to enter vigorously into competition in Massachusetts". Finally, while denying New England's prayer for injunction on the ground that the prior decree inflicted on it a chronic limp in the race for business, it also rejected Food Fair's prayer on the ground that, even if the prior decree had been in error, there is no present basis for taking away the benefit of the judgment enjoyed by New England for a decade and a half—the opportunity to do business in Massachusetts under the name "New England Food Fair".

New England asserts that it has operated lawfully, within the prior decree since 1948, that its name has acquired a secondary meaning requiring protection throughout the Commonwealth, under both Massachusetts common law and the Massachusetts anti-dilution statute, and that any rights to operate within Massachusetts under the name "Food Fair" have been lost to Food Fair after sixteen years of relative inaction so far as activities in Massachusetts are concerned. Food Fair says that New England is not only barred by *res judicata* from challenging its right to use the words "Food Fair", but that the earlier decree also established that at most New England had merely a revocable authorization to use these words with a prefatory term, such authorization to end when, as now, the parties are found imminently in direct competition. Food Fair also contends that Massachusetts has been and is within its natural area of expansion, that it has long since acquired a secondary meaning worthy of protection in Massachusetts, that laches, abandonment, acquiescence, and estoppel are not present, and that even if they were, an infringer has no standing to invoke such equities.

In attempting to apply principles and precedents to the facts of this case, we recognize at the outset that the field of protection of trade names is part of the wider domain of the law relating to unfair competition, where the overriding objective of courts and legislatures is that of commercial fairness. 3 Callmann, Unfair Competition and Trade-Marks, § 67.1 (2d ed. 1950). In attempting to balance the legitimate interests of business enterprises, and the consuming public, the courts are seldom assisted by precise precedents. This case is further complicated by reason of the earlier litigation and judgment with which the parties have lived for over a decade and a half. The very existence of this judgment is one of the important facts, the proper significance of which must first be assessed.

In assessing its significance, we reject the contention of each side that the 1948 decree, by operation of the principle of *res judicata*, automatically excludes the other from using its name in Massachusetts. That decree certainly gave rights to Food Fair which still exist unless abandoned. And it gave more limited rights to New England which still exist unless they should now be revoked. We can begin our consideration of this case no more pertinently than by referring to Judge Woodbury's words at the end of this court's 1949 opinion, 177 F.2d at 186:

" * * * the parties are not irrevocably bound by the decree as it stands. If circumstances change the court below is open to the plaintiff [Food Fair] to seek modification of the present decree under the principle enunciated in United States v. Swift & Co., 286 U.S. 106, 114, [52 S.Ct. 460, 462, 76 L.Ed. 999] * * * in which Mr. Justice Cardozo, speaking for the court, said * * * 'A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need * * *. The distinction is between restraints that

give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative * * *.' "

It is true that this court, having before it the district court's finding that Food Fair would enter Massachusetts "in the near future", spoke in terms of its being the party to seek modification. But it also recognized that "the parties are not irrevocably bound" and could not have intended to give exclusive access to chancery jurisdiction to one party. This is obviously not a case where one could say that 1948 facts were "so nearly permanent" as to be a basis for rights "impervious to change". So, while we start with the 1948 decree as a significant fact, we cannot invoke the doctrine of *res judicata* and exclude from our consideration the effect of subsequent conduct over a lengthy period of time.

The earlier decree was a conscientious and sensitive effort to balance the interests of Food Fair, New England, and the public in a field and at a time when both law and technology were undergoing significant change. The then recently enacted Massachusetts anti-dilution statute recognized new grounds for relief: the likelihood of confusion and the dilution of a trade name even in the absence of confusion. But the trade name was not of the strongest order of originality, and the finding that Massachusetts lay within the area of national expansion was predicated chiefly on the assumption that Food Fair would "in the near future" expand into Massachusetts. The district court could have refused protection to the then distant prior user or it could have then awarded to it a permanent "premonitory lien" (to use the words of Learned Hand, J. in S. C. Johnson & Son, Inc. v. Johnson et al., 2 Cir., 1949, 175 F.2d 176, 180, cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527). But it took neither exterme course. It accorded a preferred status to the prior user but gave a contingent period of grace to the smaller company under a qualified and distinguishing trade name. This court deliberately left the door open for adjustments in the decree should conditions change.

Had a year or so passed and Food Fair proceeded with significant expansion into Massachusetts, the court below might well have terminated the qualified privilege given the smaller local company. Conversely, if a period of, say, fifty years had elapsed before Food Fair had attempted to enter Massachusetts, we suspect the district court might easily have found that it had abandoned its rights. But no such "easy" state of facts is before us. The unforeseen happened, and "the near future" extended for seven years before explorations began in Massachusetts, for over a decade before one site was acquired, and for nearly two decades without a "Food Fair" supermarket. In retrospect both we and the district court might have been better advised to have set a time limit for the exercise by Food Fair of trade name rights in Massachusetts. Indeed, as we grapple with the business realities of such a case as this, we wonder if our efforts at tailoring justice to individual circumstances can be more satisfactory than some kind of national trade name statute, with provisions for registration, pre-use reservation, and a procedure for deregistration of names, perhaps taking into account differences among various regions. See Yarbrough, Protection of Territorial Rights in Corporate Names and Trade Names, 19 Bus.Law. 925, 937–938 (1964).

But no time limit was set and no national statute is applicable. It is our task to establish the rights of the parties as they exist today. Just as we reject *res judicata* as a solvent for either party, so we have not been persuaded by other far-reaching contentions from both sides. On the one hand we see no merit in the argument of New England that its contingent right to use the qualified name has, through the alchemy of the Massachusetts anti-dilution statute, been vested with the right of absolute protection

throughout the Commonwealth. To say that because the decree gave a qualified right in a trade name the statute will give it absolute protection, is to ignore the original infirmity. Moreover, we are mindful that our prior interpretation of the Massachusetts statute as permissive, Esquire, Inc. v. Esquire Slipper Mfg. Co., Inc., 1 Cir., 1957, 243 F.2d 540, has been noted without disapproval by the Supreme Judicial Court of Massachusetts, Skil Corp. v. Barnet, 1958, 337 Mass. 485, 490, 150 N.E.2d 551.

■ Nor can we accept the argument that Food Fair has lost all rights to use its name in Massachusetts because of abandonment, acquiescence, laches, or estoppel. While New England constantly refers to a sixteen year period, we note that only seven years passed between the determination of the prior appeal and the commencement of Food Fair's explorations in Massachusetts, and eleven years before a site purchase was made. Certainly during this period Food Fair's constant expansion elsewhere gives no basis for assuming that it meant to abandon rights anywhere. We have seen no authority which would divest it of all its rights in Massachusetts under such circumstances. To exclude Food Fair from its rights to use its name in Massachusetts would deprive it of the fruits of its labor, investment, and litigation, would be of no countervailing great benefit to New England (which shows no sign of interest in Massachusetts-wide operations), and would be of no service to potential Massachusetts consumers.

■ On the other hand, we cannot accept Food Fair's argument that the earlier decree compels the conclusion that New England, having been adjudicated an infringer in 1948, has no rights today in the name adopted to conform to the earlier decree.

The cases cited to us where a prior user prevailed over a subsequent name appropriator lack the combination of a prior decree giving dominant rights, which were not exercised, and subordinate and qualified rights, which were exercised, over a lengthy period of time. While the lapse of such a period does not jeopardize Food Fair's rights to use its own name, we do not consider it equitable under the facts of this case that New England now be deprived of all its rights in the qualified name. The lapse of time is not a sword for New England, but in this case it is a shield.[6]

Attempting to weigh the equities, we think that depriving New England of the qualified name it has promoted for sixteen years under the authority of the prior decree would do it an injustice, would convey no critical competitive advantage to Food Fair (whose resources and multi-store capacity are in any event overwhelming), and would not appreciably benefit the public. For, while the possibility of confusion as to sponsorship of stores is present, both parties admittedly provide a high standard of quality and service.

This leaves us, as it did the district court, with the alternative of concurrent

6. In two Lanham Act trade mark cases in the Second Circuit, where there had been an earlier decree binding on the parties, the court was motivated in part at least by a disinclination to destroy what had been built on an edifice admittedly fragile in the beginning but one which had endured. In S. C. Johnson & Son, Inc. v. Johnson et al., supra, the court was reviewing its own earlier decision, 2 Cir., 1940, 116 F.2d 427, which had compelled defendant to add a suffix to his trade mark. It recognized that confusion had not been obliterated, but, even though the Lanham Act had recently been passed, refused to destroy "the assurance, which our decision gave to Johnson and his present associates, that the good-will they built up in the name of 'Johnson' they would be allowed to enjoy." 175 F.2d at 180. And in Avedis Zildjian Co. v. The Fred Gretsch Mfg. Co., 2 Cir., 1958, 251 F.2d 530, the parties had operated under a 1929 consent decree which had allowed them to use similar names. The court commented, 251 F.2d at 533, "* * * upsetting the status quo which has existed for nearly twenty years would only unfairly deprive one or the other of the parties of a profitable business."

rights to use similar, but not identical, names. In principle this would seem to respond to the interests of all parties. The type of operation envisaged by Food Fair—whether it be the purchase of a chain with its own warehouse, the operation of supermarkets in conjunction with J. M. Fields stores, or the erection of a cluster of stores in the Springfield area, or any combination of these—would not seem to be deeply prejudiced by New England's existing stores, or even some additional ones. In the competitive race, New England not only began "with a limp", as the district court noted, but is as a midget to a giant. In turn, New England is not likely to lose custom in the area where it has served the public and built a reputation. As for the public, there would be confusion in areas served by both enterprises, but, at least at present, we see no evidence that it would suffer in quality of service or that the reputation of either party would suffer in the process. We note also that New England has not only faithfully adhered to the earlier decree in its use of a preface but that recently it has taken further steps in its own interest, the effect of which is further to minimize the likelihood of confusion. We refer to the emphasis of the rubric "BI-LO" on its products and in its advertising.

But adoption of the alternative of concurrent rights to use similar names does not answer all questions. There remains the definition of the area within which concurrent rights should exist. No claim is made that New England, simply because of its name, adopted to comply with the earlier decree, should have rights throughout New England. To urge this would indeed be to attempt to parlay a preface into a far wider hunting license than was ever contemplated by the parties or the court.[7]

■ The district court would give New England a franchise throughout Massachusetts. There is no clearcut reason set forth for this result, except that the prior decree had given a Commonwealth-wide opportunity. New England argues that the Massachusetts anti-dilution statute gives statewide protection. But, as we have noted, the earlier decree gives no more permanent rights to New England than it does to Food Fair. And the Massachusetts statute is of general application; it cannot give greater rights to a name dependent on a decree than the decree itself gives. Nor can cases following the statewide protection language of Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, enlarge the reach of a trade name sired and succored by an earlier decree.

What troubles us about statewide concurrent rights is that this result seems to overbalance the scales in favor of New England. As far as Food Fair is concerned, in its long range planning for Massachusetts, it cannot think of New England as now organized and financed. It must consider the possibility that, after further promotion of the "Food Fair" label in Massachusetts, enough good will would have been generated throughout the Commonwealth to induce a large chain to purchase New England and engage in wide scale, aggressive competition. This possibility would tend to cause Food Fair's plans and initiatives to be more limited than they would otherwise be.

As for New England, it has done nothing to earn a reputation in western Massachusetts. The district court has found that "New England Food Fair" has acquired a secondary meaning only in parts of eastern Massachusetts. In western Massachusetts, New England is in exactly the same position as it would have been in had Food Fair entered Massachusetts and sought a revision of the earlier decree in 1950. While we say that lapse

---

7. We have noted with some concern, however, that counsel for New England at the hearing before the district judge described its right to expand in the following ways: (1) "the mid-Massachusetts area east of Worcester"; (2) "throughout Massachusetts"; and (3) "throughout the adjoining New England States".

of time should serve New England as a shield, the shield is of modest size.

As far as the public is concerned, it would be disadvantaged by either full scale confusion of names by aggressive, statewide competition under similar names or by the guarded and limited entry into Massachusetts by Food Fair, which might well be restrained by the possibility of big chain competition.

This leaves us with two alternatives: to confine New England to its existing locations or to the area where its past efforts have produced significant customer good will. The former alternative has the merits of simplicity. But it seems to us to be unduly restrictive. When an enterprise operates under a court-allowed name for about a decade and a half without challenge to its way of doing business, it has for some time reasonably relied on the assumption that it can build for the future on its name. See footnote 6, supra. Perhaps it could not so rely one year or three years after it received an admittedly revocable privilege. But after a much longer period it could reasonably rely on this. And we assume that New England, like any good business enterprise, has not been content with a perpetual *status quo*, but has had an eye for future expansion, as indeed the evidence of its explorations shows. Its service and promotional activity have had as an incentive the possibility of some further expansion. If we say that New England has obtained, under the unique circumstances of this case, the right to continue doing business under its present name, we must, we think, also say that this right includes that of being able to contemplate some expansion. Therefore we do not limit it to its existing locations.

But the area of expansion must be linked to its activity over the years since the last decree. To give New England an area which it has done nothing to penetrate is, to add to the district court's appropriate analogy, to equip it with a cane to compensate for our earlier court-inflicted limp. This brings us to the conclusion that New England's right

to continue using its name be confined to the area where its past efforts have produced a customer or potential customer knowledge and good will. The district court describes this area in three ways: first, "in Greater Boston, in Danvers, and to some extent in other parts of Eastern Massachusetts"; second, "only within the Eastern part of the Commonwealth of Massachusetts and on its fringes"; and, finally, "in Brookline, in other parts of Greater Boston, in Danvers, and in the vicinity of those places".

At this point there is a need to give substance and certainty to the rights and expectations of the parties; to minimize the prospects of future customer confusion; and, to the extent feasible, to make further litigation unnecessary. We think this can be done by a decree embodying more precise guidelines as to the area, the time, and the manner in which the rights of the parties may be exercised. We therefore conclude that this cause should be remanded to the district court for these purposes, one or more of which may justify the services of a master.

As to area, the objective should be to ascertain with definiteness the areas where New England, because of its past service and promotion, has developed a significant secondary meaning for its own trade name and has therefore earned the right to future exploitation. Within this area both parties would have the right to use their present name, despite potential customer confusion.

As to time, the objectives should be to weight the scales in favor of minimizing future confusion and to forestall future recourse to the courts occasioned by lack of expansionary activity within reasonable periods. New England should lose its rights to expand further within its more limited area if reasonable periods of time pass without the development of additional enterprises. Such a limitation, while giving New England reasonable flexibility to expand, would work a forfeiture of expansionary rights after continued non-exercise and would tend to restrain confusion in the area of con-

current use. By the same logic, Food Fair, after seventeen years from the date of our last opinion in 1949, should have its exclusive rights to the use of the words "Food Fair" in Massachusetts (beyond the area of concurrent use) conditioned by reasonable exercise of these rights within a further reasonable period.

Finally, as to manner of exercise of the rights so established, we have taken note of New England's steps in its recent out-of-store advertising which have had the effect of subordinating "Food Fair" to "BI-LO." It may not seem unfair, in the interest of minimizing confusion, to exact as a requirement what has been voluntarily initiated. Therefore, the district court might also consider the feasibility of requiring continued subordination of the "Food Fair" words in New England's out-of-store promotional activities. If feasible, such a continuing provision in the decree would allow summary redress without extensive relitigation should the time come when New England's promotional activities appear to parallel too closely those of Food Fair. See Esquire, Inc. v. Esquire Slipper Mfg. Co., supra, 243 F.2d at 546.

Judgment will be entered vacating the judgment of the District Court and remanding the action for further proceedings consistent herewith. No costs.